## Court of Appeals.

June, 1905.

# THE PEOPLE v. ALBERT T. PATRICK.

(182 N. Y. 131.)

1. Murder—Sufficiency of Evidence—Corroboration of Accomplice—Corpus Delicti—Forgery—New Trial.

The evidence reviewed upon the trial of an indictment for murder charging the defendant with having effected the death of the deceased by means of poison administered by an accomplice; consisting of the latter's testimony, which gave the details of the crime, charged that its commission was induced by the defendant, narrated circumstances tending to show that it was the result of a conspiracy between the defendant and himself to secure possession of the property of the deceased, evidenced by a will in favor of defendant and by various transfers to him of property, all purporting to have been executed by the deceased, but which in fact were forged by the defendant with the aid of his accomplice, such evidence also embracing facts and opinions, expert and lay, tending to corroborate such testimony, and *held* sufficient to warrant its submission to the jury, and the finding that the testimony of the accomplice was corroborated by proof of independent and material facts connecting the defendant with the crime; and as corroborated, justified the findings that the accomplice with the intent to kill administered chloroform to the deceased; that death resulted from the effects of the chloroform and from no other cause; that the defendant with the intent to procure the death of the deceased, aided, abetted, counseled, advised or procured such accomplice to kill him. The facts particularly considered were those relating: 1. To the *corpus delicti;* 2, to the corroboration of the testimony of the accomplice; 3, to the various forgeries involved. Also *held,* that the interests of justice do not demand the exercise in this case of the broad powers conferred by the State upon the Court of Appeals to reverse a judgment of conviction upon the facts and to grant a new trial. In the absence of legal error, therefore, affecting some substantial right of the defendant, a judgment entered upon a verdict convicting him of the crime of murder in the first degree, based upon such findings, must be affirmed.

2. BASIS FOR HYPOTHETICAL QUESTION.

A hypothetical question to a medical expert assuming a congestion of the lungs " that was not exactly co-extensive," when the testimony shows that the congestion was co-extensive, is properly objected to and justifies the trial court in compelling the alteration of its phraseology.

3. HEARSAY.

Where the issue was whether as part of the scheme to obtain possession of the property, a letter from the deceased to defendant requesting the cremation of his body had been forged, statements by the deceased to an intimate acquaintance who was called as a witness, expressing himself in conversation as in favor of cremation, have no relevancy to the question of the genuineness of the letter, and are properly excluded upon cross-examination.

4. COMPETENCY OF ATTEMPT BY ACCOMPLICE AT SUICIDE ADVISED BY DEFENDANT.

Evidence of an attempt at suicide by the accomplice by means of a penknife, he having testified that the defendant had advised their jointly committing suicide, and had furnished him with a knife for the purpose, some months after the death of the deceased, while both were confined in prison under the charge of forgery, is competent: it tended at least to show the continuance of the conspiracy: to prove an attempt by the defendant to destroy proof of his guilt: and bore upon the credibility of the accomplice in testifying that the defendant had advised suicide and had furnished him with a knife for the purpose.

5. ADMISSIBILITY OF CONVERSATION AT INTERVIEWS WITH COUNSEL.

Permitting the accomplice to testify to conversations at interviews when he, the defendant, and counsel were together, do not constitute reversible error, when the relation of counsel was not shown to exist or the conversation was conducted between him and the defendant, so as not to be overheard by the counsel, or the objection to the testimony was too general; especially when the trial court excluded so much of the testimony as was offered to prove admissions on the part of the defendant.

6. WAIVER OF PRIVILEGE AS TO COMMUNICATIONS TO COUNSEL.

Where, upon the cross-examination of the accomplice, it was shown that he had made false statements to the district attorney concerning the death of the deceased, it is not erroneous to allow the prosecution to show that at a date prior to the statements he had told his counsel, who was also counsel for the defendant, that he had chloroformed the deceased, he being allowed to testify only to the fact that he had told the counsel of his own guilt; the fact that both had the same counsel

did not prevent him from waiving the privilege accorded by the statute, and permit the extension of the defendant's privilege so as to exclude his statement.

7. COMPARISON OF HANDWRITINGS.

Where a clerk of the deceased's bankers, who was familiar with his handwriting for many years, had been examined by the prosecution and had testified to the spuriousness of signatures of the deceased upon disputed instruments, and the defendant submitted to him certain signatures purporting to have been made by the deceased, which were visible only through slits or openings made in envelopes and he pronounced his opinion on them, and one of the signatures, which he pronounced genuine, had been written, inferentially, by an expert in handwriting, who was called as a witness, and was shown the signature but without the envelope, but was not allowed to testify about it or to the effect that he had written it, the exclusion of the expert's testimony, even if erroneous, must be regarded as of negligible importance, where a large amount of expert evidence was admitted upon the subject and the jury must have inferred from the questions that their purpose was to prove that the clerk had made a mistake in the comparison of signatures.

8. ERRORS NOT AFFECTING DEFENDANT'S SUBSTANTIAL RIGHTS, NO CAUSE FOR REVERSAL OF JUDGMENT OF CONVICTION.—CODE CR. PRO. SEC. 542.

Conceding that some of the rulings of the trial judge were erroneous, they affect no substantial right of the defendant, and, under section 542 of the Code of Criminal Procedure, they must be regarded as technical and a judgment of conviction affirmed.

9. NEW TRIAL UPON THE GROUND OF NEWLY-DISCOVERED EVIDENCE.

A motion for a new trial upon the ground of newly-discovered evidence upon allegations that complete immunity had been accorded to defendant's accomplice; that two coroners' physicians, who testified as medical experts concerning the autopsy, had stated to others thereafter that death resulted from old age and that no suspicious cause of death had been revealed; that they had been paid by the county for their services to the prosecution in preparing themselves as medical witnesses for the trial and that there was an intimate connection between the proponents of a will, which if the will alleged to have been forged was valid, was supplanted thereby, and the prosecution, is properly denied where the record shows nothing which if true is either entitled to be regarded as newly-discovered evidence, or if it might be so regarded went further than to affect the credibility of the witnesses. The trial judge denied the motion upon the ground that substantially all the matters and conditions claimed to have been newly discovered since the trial were within the knowledge of one or all of

the counsel for the defendant from the inception of the criminal charge, and that the cross-examination of the witnesses for the prosecution indicated the possession of knowledge or that it could have been acquired by use of the opportunities afforded. Whether or not a new trial should be granted was a matter within his discretion, which was fairly exercised, and with which the Court of Appeals will not interfere.

APPEAL from a judgment of the Court of General Sessions of the Peace in and for the county of New York, rendered April 7, 1902, upon a verdict convicting the defendant of the crime of murder in the first degree and from an order denying a motion for a new trial.

The facts, so far as material, are stated in the opinion.

David B. Hill for appellant. The formal motion for a new trial, which was made by the defendant after judgment herein on affidavits, should have been granted by the court. (Union Bank v. Mott, 17 How. Pr. 354; Comrs. of Excise v. Purdy, 13 Abb. Pr. 437; People v. Briggs, 60 How. Pr. 17; People v. Price, 6 N. Y. Cr. Rep. 141; Ward v. Town of Southfield, 102 N. Y. 287; People v. Vanderhoff, 71 Mich. 158; Hurd v. People, 25 Mich. 416; Wellar v. People, 30 Mich. 23; People v. Fielding, 158 N. Y. 542; People v. Mull, 167 N. Y. 255.) The motion for a new trial should have been granted upon the ground that there was disclosed on the motion the real and negative character of the autopsy and the true relation of Dr. Williams and Dr. Donlin to the prosecution as distinguished from their tender and description at the trial as disinterested witnesses and unbiased public officials. (People v. Vanderhouse, 71 Mich. 175; Corley v. N. Y. & H. R. R. Co., 12 App. Div. 409; Hatch v. Mann, 15 Wend. 44; McCarthy v. Bonynge, 12 Daly, 356; 101 N. Y. 668; Lyon v. Hussey, 82 Hun, 15; Harris v. More, 70 Cal. 502; People ex rel. Whitman v. Goldenkranz, 38

Misc. Rep. 682; People ex rel. Williams v. Zucca, 36 Misc. Rep. 260; People ex rel. Hamilton v. Bd. Suprs., 35 App. Div. 239; People ex rel. Tripp v. Bd. Suprs., 22 Misc. Rep. 616.) The authority of the court to grant new trials after judgment is not only conferred by statute, but is inherent in the court itself. Whenever there has been fraudulent concealment or artifice practiced to the injury of a defeated suitor, the subsequent discovery thereof presents a case entitling such suitor to a new trial upon proper application to the court. (Wolf v. Mahan, 57 Texas, 171; Corley v. N. Y. & H. R. R. Co., 12 App. Div. 409; Brooks v. R. Ry. Co., 63 N. Y. S. R. 508; Raphaelsky v. Lynch, 2 J. & S. 31; Harris v. Ditson, 13 N. Y. S. R. 337; Ward v. Town of Southfield 102 N. Y. 287; U. S. v. Throckmorton, 98 U. S. 61; People v. Mull, 167 N. Y. 255; People v. Coombs, 158 N. Y. 532; People v. Bissert, 71 App. Div. 133.) Viewing the motion for a new trial as an ordinary application to the court on the ground of newly-discovered evidence, and independently of the concealment and artifice practiced at the trial, a new trial should have been granted in furtherance of justice. (U. S. v. Dunlop, 165 U. S. 486; W. S. P. Co. v. Barclay, 14 N. Y. S. R. 879; Holmes v. Rogers, 32 N. Y. S. R. 470; Corley v. N. Y. & H. R. R. Co., 12 App. Div. 409; Guyot v. Butts, 4 Wend. 579; Niles v. Brackett, 15 Mass. 378.) The conviction was not justified by the evidence, and cannot be sustained in law. (State v. Nesenhener, 65 S. W. Rep. 230; Pitts v. State, 43 Miss. 472; Joe v. State, 6 Fla. 591; Hatchett v. Com., 76 Va. 1030; 2 Bishop on Crim. Proc. sec. 650; Wills on Cir. Ev. sec. 233; 20 Am. & Eng. Ency. of Law [2d ed.], 544; Stevens v. People, 4 Park. Cr. Rep. 396; People v. Ledwon, 153 N. Y. 20; People v. Buchanan, 145 N. Y. 1; People v. Harris, 136 N. Y. 423; People v. Benham, 160 N. Y. 425; People v. Kerrigan, 32 N. Y. Supp. 367.) The court should have instructed the jury

as matter of law to disregard the evidence of the witness Jones. (People v. Davis, 15 Wend. 607; People v. Ledwon, 153 N. Y. 10; People v. Evans, 40 N. Y. 1; The Santissima, 7 Wheat. 283.) The action of the court in refusing to permit the defense to phrase a hypothetical question which did not contain the recital, as an element, of a "co-extensive congestion of the lungs" and in ruling out the question which used the language of Dr. Donlin's testimony, "congestion that was not exactly co-extensive," was error of the most prejudicial character. (Stewart v. Field, 90 N. Y. 640; People v. Conroy, 151 N. Y. 543; Cole v. Fall Brook Coal Co., 159 N. Y. 59; Stearns v. Field, 90 N. Y. 640; Cowley v. People, 83 N. Y. 464; Dilleber v. H. L. Ins. Co., 87 N. Y. 79; 11 N. Y. Ann. Cas. 37; Gray v. B. H. R. R. Co., 72 App. Div. 424; Woodward v. C. M. & S. P. Ry Co., 122 Fed. Rep. 66.) The exclusion of the testimony of the witness Charles T. Adams was a serious error which greatly prejudiced the defendant's rights. (Bean v. Tonnele, 94 N. Y. 381; Costello v. Crowell, 183 Mass. 352; 1 Taylor on Ev. sec. 576; Rice on Ev. 328; McKeon v. People, 1 N. Y. Cr. Rep. 457; People v. Choy Ah Sing, 84 Cal. 276; Plummer v. Comm., 1 Ky. 76; Arnold v. State, 9 Tex. App. 435; People v. Driscoll, 107 N. Y. 414; Donohue v. People, 56 N. Y. 208; People v. Jones, 106 N. Y. 523; People v. Gehmele, 1 Sheld. 251.) There was no adequate or legal evidence amounting to a corroboration of the testimony of the accomplice Jones, connecting the defendant with the commission of the crime of murder; and the court should have so advised the jury. (Code Crim. Pro. sec. 399; People v. Page, 162 N. Y. 272; People v. O'Farrell, 175 N. Y. 323; People v. Ledwon, 153 N. Y. 20; People v. Courtney, 28 Hun, 594; People v. White, 62 Hun, 114.) It was reversible error and, in any event, an abuse of discretion for the court to have refused to receive evidence as to Dr. Don-

lin's statements at the autopsy, and to refuse to allow Dr. Donlin to be recalled and asked whether he did not make statements at the time of the autopsy, to the effect that Rice had died of old age. (People ex rel. Burr v. Zeyst, 23 N. Y. 142; People v. Johnson, 140 N. Y. 350; Comm. v. Dunneen, 128 Mass. 422; People v. Wilson, 109 N. Y. 345; Matter of Hesdra, 119 N. Y. 615; Pyle v. Pyle, 108 Ill. 289; People v. Gonzalez, 35 N. Y. 49; Greenfield v. People, 85 N. Y. 75; People v. Deacons, 109 N. Y. 374; State v. Morley, 102 Mo. 374.) The rulings of the court permitting evidence as to Short's being under indictment, and thereafter excluding evidence on the part of the defense as to the circumstances and causes of the indictment, were grossly prejudicial. (Van Bokkelen v. Berdell, 130 N. Y. 140; People v. Sullivan, 34 App. Div. 544; Wilson v. Eveline, 35 App. Div. 92; People v. Dorthy, 20 App. Div. 308; Hirschman v. Cohn, 38 App. Div. 351; People v. Glennon, 37 Misc. Rep. 1; Sacia v. Decker, 1 Civ. Pro. Rep. 47; Carlson v. Winterson, 147 N. Y. 652.) The admission in evidence of Jones' alleged attempts at suicide was error. (People v. Davis, 56 N. Y. 95; People v. Hall, 94 Cal. 595; People v. Kraft, 148 N. Y. 631; People v. Sharp, 107 N. Y. 427.) Serious errors, prejudicial in character, were committed in rulings as to privileged communications between attorney and client. (Weeks on Attorneys [2d ed.], 379; People v. Atkinson, 40 Cal. 284; Bacon v. Frisbie, 80 N. Y. 394; Feeney v. L. I. R. R. Co., 116 N. Y. 375; Deckert v. M. E. L. Co., 39 App. Div. 490; Jackson v. Denison, 4 Wend. 558; Jackson v. Burtis, 14 Johns. 391, 399; Rex. v. Dixon, 3 Burr. 1687; State v. James, 34 S. C. 49; Sutton v. State, 16 Tex. App. 490; Armstrong v. People, 70 N. Y. 38, 47.) The court erred in admitting the declarations and conversations of the witness Jones in the

absence of the defendant. (Ormsby v. People, 53 N. Y. 472; People v. Pavlik, 7 N. Y. Crim. Rep. 30.)

William Travers Jerome, District Attorney (Judson S. Landon and Howard S. Gans of counsel), for respondent. The motion for a new trial was properly denied. (Code Crim. Pro. sec. 465; People v. Priori, 164 N. Y. 459; People v. Shea, 16 Misc. Rep. 111.) Whether the recorder should grant a new trial was within his discretion, with which this court will not interfere, if he fairly exercised it. (People v. Buchanan, 145 N. Y. 1-30.) The dead body was found with marks of fatal violence upon it, and satisfactory evidence was introduced as to the criminal infliction of such violence, and thus the corpus delicti was proved. (People v. Burness, 178 N. Y. 429; People v. Deacons, 109 N. Y. 374; Comm. v. Costley, 118 Mass. 1; Comm. v. Hackett, 2 Allen, 136.) The conviction was justified by the evidence. (People v. Buchanan, 145 N. Y. 1; People v. Harris, 136 N. Y. 423; People v. Benham, 160 N. Y. 402; People v. Jones, 99 N. Y. 667; People v. O'Sullivan, 104 N. Y. 481.) The testimony of an accomplice, if there is any other evidence tending to corroborate it which, if believed by the jury, would tend to support their verdict of conviction, must be submitted to them. (People v. O'Neil, 109 N. Y. 251; People v. Chapleau, 121 N. Y. 266.) The refusal of the court on defendant's direct examination "to permit the defense to phrase a hypothetical question which did not contain the recital, as an element of co-extensive congestion of the lungs, and in ruling out the questions which used the language of Dr. Donlin's testimony, 'congestion that was not exactly co-extensive,'" was no error. (People v. Harris, 136 N. Y. 423; Stearns v. Field, 90 N. Y. 640.) The court did not err in excluding testimony of Mr. Adams, offered by the defendant, as to what Mr. Rice said to him upon the subject of cremation. (Throckmorton v. Holt, 180 U. S. 552; Matter of

Kennedy, 167 N. Y. 163; Johnson v. Hicks, 1 Lans. 150; Waterman v. Whitney, 11 N.' Y. 157; Marx v. McGlynn, 88 N. Y. 357; Jackson v. Betts, 6 Cow. 376; Jackson v. Kniffen, 2 Johns. 31; People v. Tuczkewitz, 149 N. Y. 240; 11 Am. & Eng. Ency. of Law (2d ed.), 504; Comm. v. Webster, 5 Cush. 295; Gardiner v. People, 6 Park. Cr. Rep. 155; Comm. v. Sacket, 22 Pick. 394.) There was adequate legal evidence amounting to a corroboration of the testimony of the accomplice Jones. (People v. O'Farrell, 175 N. Y. 323; People v. Wayman, 128 N. Y. 585; People v. Hooghkerk, 96 N. Y. 149; People v. Ryland, 97 N. Y. 126; People v. Ogle, 104 N. Y. 511; People v. Everhardt, 104 N. Y. 591; People v. Elliott, 106 N. Y. 288; People v. Jaehne, 103 N. Y. 182; People v. Mayhew, 150 N. Y. 346; People v. O'Neil, 109 N. Y. 251.) There was no error in refusing to receive evidence as to Dr. Donlin's statements at the autopsy and in refusing to allow Dr. Donlin to be recalled and asked whether he did not make statements at the time of the autopsy to the effect that Rice had died of old age. (Hart v. H. R. B. Co., 84 N. Y. 56; Palmer v. Haight, 2 Barb. 210; Kimball v. Davis, 19 Wend. 437; Martin v. N. Y., N. H. & H. R. R. Co., 103 N. Y. 626; Waldele v. N. Y. C. & H. R. R. R. Co., 95 N. Y. 274; People v. Driscoll, 107 N. Y. 414; People v. Smith, 172 N. Y. 210.) It was competent upon cross-examination of the witness David L. Short to show his interest in this case, and also his relations to it, as tending to show his bias. (Ryan v. People, 79 N. Y. 593; Newton v. Harris, 6 N. Y. 345; People v. Brooks, 131 N. Y. 321.) The admission of evidence of Jones' alleged attempt to commit suicide was not error. (People v. Gonzalez, 35 N. Y. 49; King v. N. Y. C. R. R. Co., 72 N. Y. 607; People v. Gardner, 144 N. Y. 119; Cowley v. People, 83 N. Y. 464; People v. Johnson, 140 N. Y. 350; People v. Buddensieck, 103 N. Y. 487.) No error was committed by the court in ruling as to alleged privileged communications between the defendant

and Mr. Potts. (Renihan v. Dennin, 103 N. Y. 573; Rosseau
v. Bleau, 131 N. Y. 177; Doheny v. Lacy, 168 N. Y. 213;
People ex rel. Mitchell v. Sheriff, 29 Barb. 622; Coveney v.
Tannahill, 1 Hill, 33; Jackson v. McVey, 18 Johns. 330;
Brandt v. Klien, 17 Johns. 335; Greenl. on Ev., § 245; State
v. Tall, 43 Minn. 273; Oliver v. Pate, 43 Ind. 132; Jones v.
State, 65 Miss. 179; People v. Gallagher, 75 Mich. 512.)
There was no error in rejecting the testimony of Dr. Millican
as to information obtained by him as a result of his studies
of chloroform poisoning. (Harris v. P. R. R. Co., 3 Bosw. 7;
Foggett v. Fischer, 23 App. Div. 207; McEvoy v. Lommel, 78
App. Div. 324; Pahl v. T. C. R. R. Co., 81 App. Div. 308;
Comm. v. Wilson, 1 Gray, 338; Comm. v. Sturtivant, 117
Mass. 122.)

GRAY, J.: The defendant was charged in the indictment with
murder, in the first degree, committed upon William M. Rice
by administering to him mercury, chloroform, and other
poisons. When arraigned, he pleaded "not guilty." A trial
was had, in the Court of General Sessions of the Peace of the
city and county of New York, at which he was convicted,
upon the verdict of a jury, as charged in the indictment.
Upon the trial, the prosecution relied upon the administration
of chloroform as the means employed for causing death.
From the judgment of conviction, and from an order deny-
ing him a new trial, the defendant has appealed to this court.
It is his contention that the evidence was insufficient to justify
the verdict and that errors were committed upon the trial,
which require that this court should reverse the judgment and
award him a new trial. Especially does he insist upon being
granted another trial, because of certain evidence, which, he
alleges, was discovered after the judgment and so affects the
proof relied upon by the prosecution, as to make it probable

that a different verdict would be rendered. This is a very serious charge and, in order that justice shall appear to have been done upon the trial of the defendant, an examination and a consideration of the evidence become necessary, which must be somewhat extended. The enormous size of this record casts upon us a burden, which might well have been lightened by eliminating from the appeal book much of discussion between court and counsel and much of repetition in testimony. The matter could have been of benefit neither to the defendant, nor to the People. This case has the interest and it is invested with the seriousness, which characterize all cases, in which the infliction of the death penalty depends upon presumptive proof of the crime charged. The theory of the People was that the defendant had conspired with Charles F. Jones, the valet, or, as sometimes called, the secretary, of Rice, to kill Rice and that the defendant procured Jones to administer chloroform to him in accomplishment of their joint purpose. This purpose, they say, was motived by the desire to obtain possession of Rice's estate, through a will in favor of the defendant and through various transfers to him of properties; all purporting to have been executed by Rice, but which had, in fact, been forged by the defendant with Jones' aid. The defense is based upon a denial that Rice's death was effected by violent means, or that it was by the procurement of the defendant; and the proposition is advanced that the forgeries were not brought home to the defendant, or, if the evidence warranted the finding that they were, that that fact did not, necessarily, fasten upon him a criminal agency in the murder.

A careful reading of this record and a grave consideration of the matters of proof have convinced me that the jury reached a just conclusion and that there is no warrant for, nor do the interests of justice demand, our interference with the judgment. I see no occasion for the exercise in this case of

the broad power conferred by the state upon this court, in capital cases, to reverse a conviction and to grant a new trial upon the indictment.

In the evolution of the common law, it become essential, in order to convict a person accused of homicide, to prove that the crime had, in fact, been committed. The corpus delicti, which is to say, the body of the crime, or the fact that a murder had been committed, was required to be satisfactorily established by proof of death and that the death was caused by the criminal agency of the accused. The rule existed under the Roman civil law and the English judges adopted it, because of the number of· deplorable instances of the execution of innocent persons, upon convictions resting upon merely incriminating circumstances and having no support, either, in some certain proof of the death of the supposed victim, or in that of the fact of a homicide. (2 Hale P. C. 290; 1 Starkie on Evid. 575; 3 Greenl. Evid. secs. 30, 131.) This humane rule of the common law was early incorporated in the body of our laws and is now embodied in section 181 of the Penal Code; which provides that "no person can be convicted of murder, or manslaughter, unless the death of the person alleged to have been killed and the fact of the killing by the defendant, as alleged, are, each, established as independent facts; the former by direct proof and the latter beyond a reasonable doubt." The death of Rice being undisputed, the question, which we have to consider, is whether the evidence was so strong and so cogent that the jurors might, justly and intelligently, say that beyond a reasonable doubt, the death was caused by the criminal agency of the defendant. It was not claimed that he committed the act, by which Rice was made to die; for the prosecution had the voluntary confession of Jones that it was he who did it, being induced and aided thereto by the defendant. But the defendant was a principal in the commission of the crime, under our law, if he

aided and abetted it, whether present, or absent; or if he, directly, or indirectly, counselled, commanded, induced, or procured another to commit it. (Penal Code, sec. 29.) The trial, therefore, presented these questions to the jury upon the evidence, whether it was established that the death was the result of poisoning and whether that result was aided, or abetted, induced, or procured, by the defendant. Circumstantial evidence was sufficient for their determination, the death being admitted, if it was of such a character as to leave the inference of guilt the only reasonable one possible from the facts disclosed. In other words, the whole question of fact was the personal guilt of the defendant and it was perfectly competent for the jury to act upon presumptive proof in its determination. (1 Starkie on Evid. 719, 720; Ruloff v. People, 18 N. Y. 179; People v. Bennett, 49 ib. 137, 144; People v. Harris, 136 ib. 423, 429, 10 N. Y. Crim. 260.) It was only necessary to a verdict of guilty, if they found the cause of death to have been through the administration of chloroform, upon evidence pointing with conclusive force to that result, that the jurors should, further, find that the defendant acted with Jones in the pursuance of a common design to effect the death. His presence in the felony was constructive, if the evidence established that he worked with Jones towards the preconcerted end and if he was so situated as to be able to move, and to aid, his accomplice in the execution of their common design. (See People v. Bliven, 112 N. Y. 79, 86; 6 N. Y. Crim. 370.)

As I have said, the testimony of Jones was relied upon by the People to establish the criminal agency of the defendant in the homicide; but, it being the testimony of an accomplice, it was essential to a conviction that he should be corroborated by such other evidence as would tend to connect the defendant with the commission of the crime. (Code Crim. Proc. sec. 399.)

I shall consider, in first order, the death of Rice, the facts preceding and attending it and the opinions of medical witnesses as to its cause. Jones had been employed by Rice in the general capacity of a secretary and a man of all work, for several years. He was twenty-seven years of age. Rice was a man of eighty-four years of age and occupied an apartment in the city of New York. At, and prior to, the time of his death, none other than Jones was a member of his household; although a colored woman came in the daytime to do chores in the way of cleaning. He had no physician in attendance upon him; until in the spring, or in the early part of the summer, of 1900, when Dr. Curry, the friend and the physician of the defendant, at the latter's instance, was brought in by Jones, upon an occasion. Jones testified that Rice's attention had been arrested by a magazine article on chloroform and its use; that he, Jones, mentioned it to defendant and that, after several conversations with defendant upon the subject the latter proposed that mercury should be given to Rice, as a mode of weakening his system, preparatory to administering chloroform. The designs upon Rice's property, which his death was to further, will be discussed later. Jones got the deceased, occasionally, a few weeks before his death, to take some mercurial pills, which he obtained upon a prescription that Dr. Curry had given him during some attack of his own. Their effect was to cause a light diarrhœa, which soon passed over. The defendant, then, as Jones testifies, furnished him with some stronger mercurial pills, which affected Rice by causing a severe diarrhœa. Dr. Curry attended upon him; but was in ignorance of his having taken the pills. Some days before his death, the deceased being made ill by eating bananas, suggested by a friend as a cure for indigestion, again, had resort to the mercurial pills; with the result, however, of benefiting his physical condition. On Friday and Saturday, September 21st and 22d, he was

rather ill, weak and at times, on Saturday, delirious.   On
Sunday, having slept well, he felt better, and Dr. Curry said
he was getting along very well, at a little before noon.   In
the evening, Rice was sleeping soundly; when, at about eight
o'clock, while still sleeping, Jones saturated a sponge with the
contents of a bottle containing about two ounces of chloroform,
given him by the defendant, as he says, with instructions for its
use, placed it within a cone made from a towel and put it over
the face of the sleeper.   He left the room for thirty minutes
and, then, returning, removed the towel-cone from the face,
threw it into the kitchen range and burned it up.   He opened
the windows, straightened out the room to its usual appearance,
telephoned to the defendant that the deceased was very ill and
sent a messenger for Dr. Curry.   The latter arrived some twenty
minutes afterwards, in company with the defendant, and
stated, after an examination, that death had occurred thirty
minutes, or more, before.   An undertaker was sent for by
the defendant, who, shortly after, arrived with an assistant.
Dr. Curry filled out a blank certificate with statements of
death from "old age and weak heart" and as "immediate
causes indigestion followed by collocratal diarrhœa, with
mental worry."   The defendant directed the undertaker to
have the remains cremated and not to embalm them; but,
afterwards, when it was explained that cremation could not
be arranged for within twenty-four hours, he ordered them to
be embalmed.   The assistant embalmed them that night by
injecting an embalming fluid into the arteries; which had the
effect, he testified, of driving the blood back into the heart.
The cremation was to have been on Tuesday morning; but,
before it could be done, the remains were taken charge of by
the authorities and removed to the Morgue, where an autopsy
was performed on Tuesday, September 25th.

   As bearing upon the probabilities of the death being due,
not to the operation of natural causes, but to some criminal

agency, and before considering the medical testimony, a few facts and circumstances, in part, appearing in Jones' testimony and, in part, in that of other witnesses, might, not inappropriately, be referred to. Jones testified that, in August, when he told the defendant that Rice was improving in health, the defendant said to him "don't you think Rice is living too long for our interest." Upon his assenting, he was asked to "suggest some way to get him out of the way . . . that if he would let him (defendant) in some night, when Mr. Rice was sleeping soundly, he would come and put him out of the way." Before that, in the summer, there had been some conversation between them about chloroform. The defendant asked him if he could get some; that he wanted it for a purpose and that the law was too strict to get it here. Jones procured some to be sent on by his brother in Texas and gave it to the defendant. The sending and the receipt of it were testified to by his brother and by the express agents. Jones, further, testified that, in the afternoon of the day of the death, the defendant, after being told by him of Rice's improvement in health, gave him a bottle of oxalic acid to administer; being a vegetable poison, which would paralyze the heart. Witness tried to induce Rice to take some diluted in water; but, upon testing it, he "spit it out." The defendant, though not known to have any acquaintance, or relations, with Rice, was solicitous in frequent inquiries of Dr. Curry, as the latter testified, about Rice's health. On the day before the death, he called upon him in the afternoon and learned from the doctor that, though very weak, physically, he thought Rice would be able to go out in the following week. Letters were written by the defendant to friends of the deceased in Texas, about the middle of September, with statements that the deceased was "sick," "growing very weak;" that "he could not live very long;" that "heart action was growing very weak," or "that it was evident he could not hold out long."

The autopsy was performed, about forty-three hours after the death occurred, by Dr. Donlin, a coroner's physician, in the presence of Dr. Williams, also a coroner's physician, and of Professor R. A. Witthaus, an expert chemist. The two physicians testified that the organs of the body, except the lungs, were normal in condition, except as affected by the embalming fluid. They and Professor Witthaus agreed in their testimony that the lungs were congested. Dr. Donlin speaks of their being "congested all over;" while Dr. Williams characterized it as an "intense congestion of the lungs —co-extensive with them." · Outside of the lungs, they found no evidence of disease to account for death and, beyond their congested condition, they showed nothing beyond a small patch of consolidated tissue about the size of a twenty-five cent piece. They testified, in effect, from experience and from experiments, that nothing but the inhalation of some gaseous irritant could have produced such a general congestion, and that the lobular patch, while consistent with some congestion, was insufficient to account for the condition observed. Dr. Donlin, while testifying that he did not know the proximate cause of death, was unshaken in his statement that no cause for it was observable in the other vital organs. Dr. Williams was equally firm in making similar statements. He had made a study of the case and from that, as from experiments upon animals, he was of the opinion that chloroform inhaled would act as an irritant upon the lung and cause precisely that general congestion represented in the case of the deceased. The effect of chloroform upon the system, he says, whether as a negligible result, or as an irritant causing congestion of the lung, is dependent upon the extent to which the admixture of air is permitted in the administration of the drug. Professor Witthaus, an expert chemist, with large experience in chemical analyses of bodies, testified that he took away the intestines, stomach, liver, kidneys and heart of the deceased. His analyses

revealed the presence of mercury, obtained as calomel, and, though not in quantities sufficient to cause death, its presence indicated a larger quantity to have existed in life. He says that the embalming fluid contained no mercury and he agrees with Dr. Donlin that it would have no effect upon the lungs, when injected through the brachial arteries, beyond bleaching them. He thought that the use of formaldehyde in the embalming process would interfere with the analytical test for the detection of chloroform. Dr. Henry P. Loomis, a pathologist with much experience in autopsies, examined the heart, liver and kidneys of the deceased and found them normal, relatively to a man of his age. He found no cause for death and he gave it as his opinion that no disease will produce a congestion of the lungs, which would be co-extensive with them. Pneumonia, he says, produces a consolidation of more or less of the lung. To a hypothetical question, assuming that there was found a congestion of the lungs co-extensive with the lungs themselves and that there was no other cause of death found, he answered that his opinion was that the cause of death had been some irritant gas, or vapor, administered through the mouth; that nothing except such an irritant would produce such a congestion. Chloroform would cause it, if inhaled in excessive quantities, and experiments upon animals had shown that the amount of congestion varied with the degree of admixture of atmospheric air. A congestion, if produced at all by a kidney trouble, would be at the dependent portion of the lungs and never all over.

In behalf of the defendant, several witnesses were examined upon medical and pathological conditions, assumed in questions, which resumed the facts as they had been made to appear in the evidence for the People and in the testimony of Dr. Curry, a witness for the defendant. For example, the following question was put to Dr. Edward W. Lee, a surgeon and physician, without objection: "Q. Doctor, assuming that

a patient is eighty-four years of age; that prior to death he had dropsy of the lower limbs for several months from the knees down, and that the post-mortem findings revealed the brain to be otherwise normal; the heart normal, with a slight contraction of the pulmonary and aortic orifice; the lungs congested slightly, but the congestion co-extensive with the lungs; a small quantity of coagulated blood in the right heart; the kidneys firm, capsules not adherent; surface granular, markings fairly distinct, and a number of small cysts; and that on the day preceding his death the patient was troubled with his urine, and had to urinate frequently; that the liver was normal, and that the intestines were negative, and that on the day preceding the death of the patient he was delirious, more or less during the day, and was delirious some upon the day of his death, and there was a patch of consolidated lung tissue in the lower lobe of the right lung; about the size of a twenty-five cent piece; that the lungs were watery; what would you say would be the cause of death?" The witness answered "congestion of the lungs and diseased kidneys." It was his opinion that, while an irritant gas will produce a congestion over both lungs, tuberculosis, pneumonia and kidney disease would cause it, and that, in the case assumed, the condition of the heart occasioned the congestion. He testified, upon the subject of the administration of chloroform, that, under the circumstances as stated by Jones in his narrative of the murder, the odor should have been detected within half to three-quarters of an hour afterwards, though, when confined in a cone, the odor would not be so strong in a room, as when administered in the ordinary ways; that the cone should have fallen from the face of the patient, as the result of muscular action produced by the first exciting effects of the inhalation of the chloroform; that it might be administered in such a cautious, or stealthy, way as not to awaken the person and, referring to the burning by

Jones of the towel and sponge in the range, that chloroform was not combustible, at first, though in an hour, if exposed to the open air, it, might wholly evaporate from the cloth. Dr. James Ewing, a pathologist, in answer to a hypothetical question, substantially similar to that addressed to Dr. Lee, was of the opinion that death was accounted for in the presence of pneumonia and was not due to chloroform poisoning, though he had no experience in the use of chloroform. Doctors John H. Girdner, Isaac N. Love, Alexander Leuf and Kenneth W. Millican, physicians, testified in answer to similar hypothetical questions, resuming the bodily symptoms and conditions of the deceased, prior, and subsequent, to his death. · They agreed in opinion that there were no indications of death from chloroform poisoning and that death was due to œdema of the lungs, caused, as some of them said, by nephritis, or kidney trouble. In their opinion, chloroform was not an irritant to the lung tissue, to the appreciable extent claimed by the prosecution; the administration of chloroform to the deceased, as testified to, should have had the effect of awakening him from his sleep and its odor should have been discoverable within a half, or three-quarters, of an hour afterwards. Doctors Girdner and Love conceded, the former, that death might, within thirty seconds, have happened while the cone was being fitted and, the latter, that chloroform inhaled might have been an intervening cause of death, under the circumstances detailed by the prosecution as happening on Sunday. Dr. Austin Flint, the eminent physician, testified, in answer to the hypothetical question of the defendant, that death was due to œdema of the lungs and that there was no evidence, in the facts assumed, of its being due to chloroform. He stated that mercury could be found in the system for months after its being administered. He conceded that chloroform does, often, produce congestion of the lungs and that, while he assumed that the œdematous condition was due to congestion, there was noth-

ing to which he attributed that congestion. In rebuttal, the People examined several physicians. Dr. Hobart A. Hare, a physician from Philadelphia, had made a special study of drugs, including chloroform, and he testified that the effect of putting a cone upon the face of a sleeping man, under a state of facts similar to those detailed by the witnesses for the People, as existing in the case of the deceased, would be to cause death. He said that the facts evidenced no natural causes of death and that the administration of such a large amount of chloroform would act to depress, powerfully, the heart and the circulatory system. He saw nothing in the facts, assumed as describing the condition of the deceased for several months prior to his death, to evidence that death was approximate, or to account for an œdematous condition of the lungs. Doctors Robert C. Kemp, Alfred E. Thayer and Otto A. Schultze, physicians competent from experience to express opinions as to the effects of chloroform, testified. Dr. Kemp agreed with Dr. Hare that death would follow as the effect of such an administration of chloroform, as the prosecution claimed to be the fact. Dr. Thayer was of the opinion that nothing in the conditions, assumed by the prosecution as having been those of the deceased, accounted for his death and that his prior symptoms were not consistent with œdema of the lungs. Dr. Schultze was of the opinion that nothing in the conditions disclosed upon the autopsy showed that death was due to old age, weak heart, or mental trouble. Finally, Dr. John B. McAllister, a physician and an instructor in pathology and operative surgery on dead bodies, testified that, happening to come into the room at the time of the autopsy, he saw the body of the deceased and that there were no symptoms of dropsy of the lower limbs. This latter statement has a somewhat important bearing, in contradicting the assumption by the defense of the fact, based upon Dr. Curry's testimony, that there was a dropsical condition of the body below the knees. All of these medical witnesses in

rebuttal agreed in the opinion that the odor of chloroform, within the statement of facts assumed upon the testimony of Jones, would not be discoverable an hour afterwards.

I think I have referred to the evidence, medical and otherwise, bearing upon the death of Rice and its causes, sufficiently for the purpose of presenting that feature of the case. The jury might well find upon the evidence that the death was not the result of natural causes, and that it was due to some criminal agency. They could well conclude that the autopsy disclosed no natural cause for the death and that, in the light of the medical opinions, it could only be accounted for as having happened in the way testified to by Jones: that is, by chloroform poisoning. The physicians, who assisted at the autopsy, testified to physical conditions making a natural death incredible. It was for the jury to say whether the facts and their opinions, with that of Professor Witthaus, satisfactorily accounted for a death by chloroform poisoning. The witnesses of the autopsy testified positively to the facts of a congestion extending all over the lungs and of the other organs being in a normal condition, relatively to the age of the deceased. *The medical experts expressed opinions upon the hypothetical case put and they assumed the existence of oedema of the lungs, which must arise from — or, as Dr. Flint expressed it, which was a symptom of — a disease. If the jury believed the testimony of the physicians, who took part in the autopsy, then it is certain that there was no disease of a vital organ to account for the oedema.* It is a pathological fact that oedema is consequent upon an unrelieved congestion of the lungs. The finding of mercury in the body corroborated Jones, as to his having given mercurial pills to the deceased to weaken his system. If doubt should be thrown upon the probability of Jones being able to administer the chloroform by means of the cone left upon the face, the jury, in the light even of the evidence of the medical experts for

the defense, might believe that the effect of placing the cone upon the face of the deceased was to cause him to pass at once into a state of narcosis; or, in his weakened condition, to be stricken by death almost immediately. I do not think it necessary to dwell longer upon this phase of the case. When the rest of the evidence is considered, it will become apparent, in my opinion, that the facts reveal such a confederacy of effort between the defendant and Jones to cause the death of the deceased, as to make it impossible to come to the conclusion that a natural death occurred at a moment, apparently, so opportune for the success of the plot into which they had entered.

Jones had accompanied the deceased from Texas to New York, in 1897, and he lived with him in an apartment on Madison avenue, without other occupant. The deceased was a man of great wealth, which he had gained in Texan enterprises. He was a widower and was childless. Jones became acquainted with defendant one evening in November, 1899; when the latter called, under an assumed name, and requested to see Rice upon the pretext of some cotton business. Jones told him that Rice had retired and he, soon after, left. He called at another time, in the evening, with the same ostensible purpose; but did not see Rice. Upon that occasion, he disclosed his identity and spoke of a litigation pending in Texas between Rice and one, Holt, who was the executor of the will of Rice's wife; in which he had been acting as local counsel for Holt. His visits became of weekly occurrence; but he never came to know Rice. The Holt suit was talked of and its unfavorable aspect was represented by the defendant. He expressed great confidence, if he could get into communication with Rice, that the case could be settled. Jones told him that the deceased would not see him and that he was prejudiced against him, because of his insulting examination of some ladies, upon a commission to take testimony in New

York. Eventually, he proposed that Jones should typewrite a letter as from Rice to his lawyers in Texas, after a form which he handed Jones; in which Rice should state that, as he was a citizen of Texas and as his property was there, he was going to settle the suit. The suit referred to was brought by Rice against the executor of his wife's will; wherein she had undertaken to dispose of some $2,500,000 of his estate, upon the theory that having married without settlements, under the so-called "Community Law of Texas," she was entitled to one-half of his estate. Among other grounds for contesting the will, he claimed to have become a citizen of New York. The defendant said he would arrange for the signing of the proposed letter and would pay Jones for writing it. Jones did write it; but, the defendant not paying him, the letter was destroyed. Then the defendant expressed sympathy with Jones in the inadequate remuneration, which he received for his services, and he told him that, if he "would go into a business deal with him," he would get much more. He, soon after, showed him a form of a will by Rice, disposing of half of his property to the defendant and the remainder in bequests to relatives, friends and the "William M. Rice Institute;" a corporation which the deceased had caused to be organized in Texas for scientific, artistic and literary purposes. He proposed that Jones should typewrite it, as was his custom to do with the letters, or business papers, of Rice and he would arrange for its being signed and witnessed. This was assented to by Jones; who told the defendant of a will, which the deceased had executed in 1896. This he got and handed to the defendant; who took it and proposed to preserve it, in order that he might use it to compel the heirs to accept a later one. Wetherbee, one of two clerks in the banking house of Swenson & Sons, who had witnessed the will of 1896, was approached by Jones, at the defendant's instance, with the request to become a witness to a new will;

which Jones represented he could, by reason of his position, procure Rice to sign in one of his drowsy moments. But, though he was to be put in as an executor, Wetherbee refused. That idea was abandoned and the defendant said he would arrange for one witness and that Jones could act as the other; but Jones refused to act as such, as he wished to be a beneficiary of the will. Subsequently, Jones came to the defendant's office, when a proposed will was read to him, to which a friend and a clerk of the defendant were to act as the witnesses. To that end, Jones was to arrange to make them acquainted with his master; which he was able to do by employing them to take acknowledgments, as notary public, or as a Texas commissioner of deeds. During the summer of 1900, the defendant recommended to Jones, when ill, to employ Dr. Curry; but told him he was to caution the doctor not to mention the defendant's name in the presence of Rice. The defendant essayed, unsuccessfully, by the use of an advertisement addressed to the heirs of Mrs. Rice, to get into communication with Rice. He induced Jones to typewrite letters, purporting to be from Rice to him, the defendant; one in supposed response to the advertisement, which might furnish evidence of the inception of negotiations with defendant, and others, which, by their tenor, would express confidence in him. To perfect this plan, the defendant furnished to Jones a list of dates, running from August 3d, 1900, to August 28th, 1900, and the latter was to address and mail an envelope upon each date; into which a letter of corresponding date might be placed. Jones took the pretended letters to the defendant's office and, subsequently, mailed the envelopes. With the letters, he furnished carbon copies, as had been his custom, when acting for his master; which were to be filed, in the usual manner, in the apartment. The will purporting to have been executed by Rice upon June 30, 1900, was first seen by Jones at defendant's office, in the early part of September, and he next saw it after

Rice's death in defendant's possession. From information furnished by Jones and from the genuine will of 1896, the defendant had so drawn it, as to make more beneficial provisions for the relatives of the deceased; to give to the Rice Institute a legacy, under conditions which made it, practically, unavailable (though it had been the residuary legatee under the will of 1896), and legacies to each of the directors of the institute of a sum of money. Legacies were given to friends and to employes, and the residuary estate was given to the defendant. The defendant explained that the provisions for legacies were to interest the persons to whom given in the establishment of the will. This will was, apparently, signed upon each page by Rice; but Jones testifies that Rice had not signed it. Jones had furnished models of Rice's signature to the defendant and, in a few instances, he had allowed him to sign letters and, even, checks in payment of wages, in the name of Rice, in order to furnish standards for use after death in any litigation. Jones typewrote and gave to the defendant instruments, which assigned and transferred to him the securities, cash and property of Rice in certain safe deposit vaults, in a certain trust company and with Swenson & Sons' banking house. They were handed to the defendant unsigned and with them were carbon copies. About the beginning of September, Jones had typewritten a letter as from Rice to the defendant, dated August 3d, 1900, instructing him to have his remains cremated and not to permit them to be embalmed. As it has, elsewhere, been mentioned, Jones, at the suggestion of the defendant, introduced Dr. Curry to Rice during the summer of 1900, upon occasions when the latter was ill. He rallied after each attack and his physical condition continued without any alarming symptoms until Sunday, Sept. 23, the day of his death; although on Saturday he seemed very weak and mentally disturbed. On Sunday, he was pronounced better. He had slept well and the phy-

sician thought he would be able to go out on Monday, or during the week. On Saturday a draft for $25,000, a first install-ment of a sum of $250,000, which Rice had agreed to pay to-wards the reconstruction of a mill in Texas, was brought to the apartment for collection and Jones had been able to put off its presentment to Rice, upon the ground of his illness. Meeting the defendant at lunch, he told him of the fact. Captain Baker, the deceased's Texan counsel, was expected to arrive and a re-cent letter from Rice to him, expressing a desire to see him, had been seen by the defendant. The desire to avoid the pay-ment of the moneys and to prevent the meeting of the lawyer with his old friend and client precipitated the designs of the conspirators. On Sunday evening, Jones met the defendant upon the street. The latter had kept away from the apartment for some ten days, for fear, if Rice died suddenly, that he should come under suspicion; having assignments of all of his property. Jones told him of the improvement in the condition of Rice and of his refusal to take the dose of oxalic acid, and that he had left him sleeping soundly. When the defendant gave him the chloroform and told him how to use it, he, at first, refused; but he was, soon, persuaded to do the act by the rep-resentation that Baker's coming on might defeat their schemes and "break up everything." He went in, found Rice still sleep-ing, and killed him, as narrated elsewhere. Then, later, the de-fendant arrived with Dr. Curry, having been summoned by tele-phone. After the embalming was completed that night, the de-fendant took away from the apartment in a bag, securities of large value, $450 in bills, some silver, and two watches. Early in the morning of Monday, he returned and directed Jones to fill out some checks taken from deceased's check book, which Jones had theretofore given to him. Jones did so; filling out four to the defendant's order, for various amounts, aggregating $250,000, on the Fifth Avenue Trust Company and on Swen-son & Sons, and the defendant left with them. Jones, later in

the morning, was telephoned by the defendant that, owing to a mistake in the spelling of the defendant's name of Albert, one of the checks for $25,000 had been refused payment by Swenson & Sons and that, if they were to telephone about it, he was to say that the check was all right. Swenson & Sons did inquire over the telephone about the check and Jones said, if it was in his (Jones') handwriting, "to go ahead and certify it." Later, when again called up by the Swensons, and acting upon instructions received meanwhile from the defendant, he told them of Rice's death in the previous evening and gave them the address of the defendant, as the lawyer of the deceased. Two days after the death, the defendant told Jones that he had telegraphed to Holt the contents of an agreement, purporting to have been executed by Rice and by him, as representing Holt, on March 6th, 1900, which settled the Texan litigation by the payment of $250,000. He said that it would appear better, if the settlement of the suit should appear to have been made in the lifetime of Rice, rather than that he, the defendant, should appear to have been opposing him, while being the residuary legatee in his will. The defendnt, also, told Jones that he had promised to pay Dr. Curry $500 and that the latter had said he would render a bill for $1,000. He told him that he had torn up the carbon copies of the various letters and papers, which he had typewritten for him and which he kept at his office, and that he had so choked up his toilet in getting rid of them, that it had overflowed, and the watchman had been obliged to clear it out. He said that he was afraid to bring them up to the apartment, as it had been planned; lest he might be arrested with them on his person. On October 4th, 1900, the defendant and Jones were arrested upon a charge of forgery. While in the "Tombs," or city prison, Jones attempted suicide by means of a penknife, which had been furnished him by the defendant. After his arrest, he made several false

statements, relating to the commission of the crime, to his counsel and to the assistant district attorney. At an interview, the latter told him of various facts discovered by the office, which proved his previous statements to have been untrue and impossible of corroboration. He said that he "wanted a truthful statement; that the truth was always consistent and could be corroborated." Finally, in January, or February, 1901, Jones told the assistant district attorney of his having killed Rice by chloroform. He testified that he had not been promised any immunity.

I have now given, from the very extended examination of Jones, all that seems to be material and it remains to be seen how far his story of the crime deserved credence. It is sufficient if he is corroborated as to some material fact, or facts, which go to prove the connection of the defendant with the criminal intent and its execution. The rule is stated in Roscoe's Criminal Evidence (122), "that there should be some fact deposed to, independently altogether of the evidence of the accomplice, which, taken by itself, leads to the inference not only that a crime has been committed, but that the prisoner is implicated in it." Judge BARTLETT, in People v. Mayhew (150 N. Y. at p. 353, 11 N. Y. Crim. 513, 519), speaking for this court, observed that the corroborative evidence is sufficient, under the statute in question (Code Crim. Proc. sec. 399), if it tends to connect the defendant with the commission of the crime and he formulated, upon authority, this rule for the procedure upon the trial, that " if the trial judge is satisfied that there is testimony tending to connect the defendant with the commission of the crime, he is bound to submit the case to the jury; who are the sole judges whether the evidence relied on to corroborate the accomplice is sufficient." This is but just; or, otherwise, if the statute is to be given a narrower construction, the ends of justice might be often defeated. The law, in its humane policy, intends that the life, or the liberty, of an

accused person shall not be sworn away by an accomplice, unless the accomplice be so corroborated, as to some material fact, or facts, as that a belief in his credibility becomes reasonable and, therefore, safe to be entertained.

Much testimony was adduced with respect to the genuineness of the signatures of W. M. Rice, the deceased, as they appear upon the principal document in dispute. They were the will of June 30th, 1900; the instruments assigning and transferring to the defendant the moneys in bank and the securities in safe deposit vaults; the four checks to the defendant's order, aggregating in amount $250,000, and the cremation letter. Every one of the relatives, friends, or business acquaintances, of the deceased, who were examined, stated the signatures to these documents not to be in the handwriting of the deceased. That was the evidence of Swenson, the banker of the deceased for twenty years, and of several of his clerks; who were familiar with the handwriting of the deceased, through handling his checks and having seen him write, and two of whom had witnessed his will of 1896. Such was that of two of his agents in Texas and of five business correspondents, with whom he had been in constant communication. Baker, his lawyer and friend for some forty years, testified to the forgeries. Twelve witnesses were examined upon the subject, who were experts in handwriting and penmanship, of more or less repute and skill; who stated, upon comparisons being made with conceded signatures, taken as standards, that the signatures in question were simulations and they gave their reasons, at great length, upon direct and upon cross-examinations, for their opinions, with a greater, or lesser, degree of clearness and exactness. Meyers and Short, who appeared as witnesses upon the disputed will of June 30th, 1900, testified that they saw the deceased sign the will and gave a minute description of the occurrence at the apartment. The question of the forgery of the signatures of the deceased was one of fact for the jury

and, in my opinion, while the evidence of the experts might have been of assistance in reaching their conclusion, the jurors might, with an easy conscience and with a clearer mind, have relied upon the evidence of those, whose business it was to know the signature of Rice and to whom his handwriting had been an accustomed sight. It may be that, in instances, witnesses were confused, or mistaken, upon the test by comparisons; but, in the main, the jurors were amply justified in accepting the evidence as conclusive as to the fact of forgery having been committed. The proof was important in corroborating Jones' testimony as to the various documents having been prepared by him for, and handed to, the defendant; for he produced them after the death. The evidence was, further, material, not as, necessarily, proving the commission of the crime charged, but as tending to prove the confederacy, or the conspiracy, of the two to possess themselves of the property of the deceased. It furnished a basis for the inference that, when the intended victim failed to succumb to illness, or to the weight of years, as for a time hoped, the purpose to kill him was precipitated, in order that the plot, which the documents evidenced, might be successful. There can be no question about the motive for killing the deceased. Unless he was removed from the path, the prospect of the enjoyment of the fruits of the conspiracy was growing very dim. It, also, tended to show the utter absence of any motive in Jones to murder his employer on his own account. For he was not a beneficiary under the forged will, nor was he, apparently, to gain by the several transfers of moneys and securities, and the murder could be of no advantage to him, except for the promises of the defendant, who would, thereby, come into possession of the great estate of the victim.

In further corroboration of Jones' testimony, and as independent facts connecting the defendant with the crime, the evidence of several witnesses must be referred to    The de-

ceased had a brother and nephews, with whom, so far as the evidence shows, his relations were amicable, and he had several friends, with whom he was upon terms of a more or less intimate nature.    Among his friends was a Captain Baker, member of a Texas law firm, his personal counsel for over forty years and an executor of the conceded will of 1896.   He gave testimony of considerable value in exposing the plot of the defendant.   He described the deceased as a strong man, who had attended, personally, to his own affairs.   He testified that he had first known the defendant in Texas, about the year 1890; where he was practicing law.   He saw him in New York, in the fall of 1899; when, for several weeks, he was engaged in the taking of testimony, in the litigation instituted by Rice over his late wife's attempted testamentary disposition of a share of his estate under the Texas statute, heretofore alluded to. The defendant represented the wife's executor.   He made frequent efforts with Baker to effect a compromise and suggested that Rice should pay sums, varying from $500,000 to $250,-000.    Baker told him that Rice had a great deal of feeling about the matter and was not inclined to make any settlement, and that he regarded the defendant in a hostile manner, for being opposed in the suit.   When he next saw the defendant, it was upon his arrival in New York, after hearing of the death of his friend and client, and on the Thursday thereafter.   He saw him at the apartment and, in conversation, the latter told him of the making of the will of June 30, 1900; in which he was given the residuary estate and of which he, Baker, and a nephew, William M. Rice, Jr., were the executors.   He explained his having been made the residuary legatee by the statement that the deceased had "become stuck" on him and had thought him "the most wonderful man in the world;" that, although under no legal obligation, his purpose was to effectuate the desires of the deceased by distributing the estate in charity and to exploit his name, as that of a great philahtro-

pist. As Baker knew that he had never had any relations with Rice, he explained to him his resort to the ruse of an advertisement, which has been mentioned, through which he represented that they had become acquainted. He said that the deceased had become suspicious of Baker and, notwithstanding he was an opposing counsel in the pending litigation, he had retained his services. He told Baker that he would not qualify as executor; that, therefore, he and the other executor could share the five per cent commission between them and that Baker would be "bountifully compensated" for his services in the pending litigation. He showed Baker the cremation letter. Baker was taken to the defendant's residence and there was shown the will of 1900 and the instruments transferring all the property of Rice in moneys and securities. A general assignment, being shown, was explained to have been in consideration of an annual payment of $10,000 for the support of Rice during his life, as "the old man had tired of life and had tired of business, and that it was in pursuance of an understanding he had, by which Rice was to turn over to him all his property of every kind and character." Later, at the defendant's office, he delivered over to Baker, at the latter's request, securities, representing several hundred thousand dollars in value, taken from the apartment. He, also, turned over all of the checks, but one, which Jones testified he had filled out for him on the day after the death. The defendant told Baker that they had been sent to him by Jones the day before the death. The one check for $25,000 he had cashed and he refused to pay over the proceeds. First, he told Baker that he thought the checks were sent "to be paid to Mr. Holt in settlement all that litigation." At another time, he said that was not true and that he thought they may have been sent in pursuance of the understanding to turn over to him all of the deceased's property. He said that the deceased wished Baker and Holt to be kept in ignorance of an agreement settling the Texas suit,

through the payment of $250,000, which had been theretofore executed by the deceased and by the defendant, acting for Holt. Upon Baker's asking him why, in view of his antagonistic professional relations, he did not have the will of 1900 and the assignments of property witnessed by some friend of the deceased, or by some mutual acquaintance of standing in New York, he explained that the deceased was peculiar; that he desired their relations to be secret and that, so far as he knew, "no living man ever saw him in the presence of Mr. Rice, unless it was C. F. Jones and he did not know that he ever saw him with him." It is claimed by counsel that Baker was not an impartial, or disinterested, witness. His only interest, as I can see it, in preferring the establishment of the conceded will of 1896 to that produced by the defendant, was the very obvious one of defeating a scheme, which was to divert the Rice millions into the possession of a stranger and which he believed to be iniquitous.

Whittlesey testified to having been a close friend and a frequent visitor of Rice. He knew the defendant and, in the spring of 1900, was asked by him to see Rice upon the subject of a settlement of the Texas suit. The defendant admitted to him that he did not know Rice well enough to speak to him. The witness called on Rice and reported to the defendant that he was very decided in declining to compromise "what he considered a fraud."

Coleman testified to having been a classmate and a friend of the deceased, and to knowing the defendant. In a conversation with the latter in New York, in August, 1900, the defendant asked questions about the probable wealth of Rice and how long he and other people in Houston (Texas) thought he might live. He told him that Rice wanted to be cremated. Upon an occasion, he saw in defendant's office one of Rice's envelopes, bearing his "return card" in the corner.

Potts testified that he had always known the defendant and had occupied the same suite of offices after April, 1900. He never had seen the deceased there. He was introduced to Jones by the defendant, at the office in the spring of 1900, as the secretary of Rice. Upon an occasion, when the defendant borrowed $150 of him, a few days before Rice's death, he said to him "that rich client of mine has made a will making me residuary legatee" and he showed him, in a box at the safe deposit company, the will of 1900 and the assignments of moneys and securities. He, also, saw there some checks, blank as to amount, signed " W. M. Rice " and payable to "Albert T. Patrick, Trustee." The defendant told him he "practically owned the estate;" that he owed it to the regard and esteem of Rice and that he was to perpetuate his memory; that it was, in fact, a trust. He, also, told him that Rice "was liable to die any time." Early on Monday, September twenty-fourth, defendant telegraphed the witness of the death and to call before 9.30 A. M. Upon reaching the apartment, the defendant showed him four checks, for various amounts, which, he said, Jones had sent him on Saturday, and, at his request, he took one for $25,000 and had it certified, that morning, by the Fifth Avenue Trust Company. He, also, saw then another check on the same company for $135,000. Meldrum, a friend of the deceased, testified to the defendant's calling upon him two days after the death, when the latter spoke of the deceased having taken so remarkable a liking to him as to have made him an executor and the residuary legatee of a recent will, and that the deceased had intended to turn over all matters to him in the week following his death; that Jones had sent around the money checks on Saturday and that he had been too busy to cash them then. He corroborates Baker as to what occurred at his interview with the defendant at the apartment and at the defendant's residence, upon his arrival in New York.

Wetherbee, long a clerk with Swenson & Sons, testified in corroboration of Jones' testimony about proposing to make a new will for the deceased in January, 1900. The witness had been a witness to the will of 1896. The new will, Jones told him, was to have some changes and he was to be an executor and to share the commissions with him; each was to procure one witness and when Rice was "dopey," as he would become at times, he would sign anything Jones placed before him. He said to witness that he had been approached by two lawyers, one of whom he described as being from Texas.

Two clerks of Swenson, the banker of the deceased, testified to the presentation, on Monday morning, of the check in Jones' handwriting for $25,000, with the misspelled name of the defendant as payee, and its return, after non-acceptance, with the payee's name indorsed as written in the body.

Swenson had an interview with the defendant on Monday afternoon, in which the latter regretted the non-payment of the check and said that he had another for $65,000 and, also, an assignment to him by the deceased of securities, of which he gave him a copy. He spoke of the death as having been caused, primarily, by eating some bananas. Upon the witness expressing surprise, when he said the body was to be cremated, he explained that the deceased was a "crank on the subject of cremation;" to which the witness replied that he had never heard of it.

Gerard, a lawyer, in company with a detective officer, at Swenson's instance, called on the defendant, Monday evening, and they testified that, in conversation with him, he told of his having the will of the deceased, of his being executor and, also, of having assignments of all the securities and moneys. Upon Gerard's asking him what was the use of having an assignment, when he had a will, he answered that that was "a secret." Some days later, upon his arrest, the defendant asked Gerard and Baker, with whom he was, if they could not

"fix this up." Caldwell, a reporter, testified to an interview on Monday, in which the defendant stated to him that he had had confidential relations with the deceased as counsel; that he was not a beneficiary under the will; that the checks had been sent to him to create a trust fund and that the cremation letter had been written to him by Rice, through dictation to Jones, a few months before. Armstrong another reporter, testified to an interview with defendant on the following Thursday, in which the latter stated that, as attorney for Holt, he had been carrying on secret relations with Rice, in order to effect a settlement of the suit with Holt, by a payment to him of the sum of $250,000, and that the checks in dispute were sent to him as Holt's attorney.

In further corroboration of incidents in the story of Jones, Mayer, the defendant's office boy, testified to frequent interviews between the defendant and Jones after June, 1900, which were carefully guarded against interruptions, and to receiving envelopes with the name of W. M. Rice upon the corner. Jones' brother testified to sending the chloroform from Texas in the summer of 1900. The janitor of defendant's office building testified to discovering the overflow from defendant's toilet, in the middle of the night of Monday, September 24th, and to the defendant's explanation to him of having choked it up with papers. Mrs. Thompson, a friend of Rice, testified to having called upon him, on Sunday evening, September 23d, at about eight o'clock, and that, after waiting some twenty minutes and sending up twice to the apartment, she left without being able to see him. Teich, the night watchman of the apartment building, and who had charge of the elevator, after seven o'clock in the evening, testified to Jones having returned to the apartment that Sunday evening, before Mrs. Thompson's call, and to his inability to obtain any response to the ringing of the apartment bell; that Jones had not gone out; that he saw him later, when Dr. Curry was sent for; that he saw the de-

fendant come in with Dr. Curry; that when defendant left the
building, he had a valise, or bag, in his hand and that he told
him, at the time, that he, Teich, had been remembered in Rice's
will.

Such, as briefly as I can, intelligibly, condense it, was the
evidence on the part of the People. The defendant did not
testify in his own behalf. Besides the medical experts, whose
testimony has been referred to, other witnesses were called by
him. Through Maria Scott, the colored woman whom Rice
had employed to clean the apartment, the defendant sought to
show that she had let him in upon two occasions. On her cross-
examination, a rather significant piece of evidence was elicited.
A day or two after the death she says that the defendant, com-
ing into the kitchen, told her that she " was accused of poison-
ing Mr. Rice . . . doing it in his cooking." She did no
cooking for him. Dr. Curry, who had been a surgeon during
the civil war in the southern army, testified to making the
acquaintance of Rice in March, 1900, when visiting Jones pro-
fessionally. At that time and, again, in August, he prescribed
mercury in pills for Jones, as a laxative. Upon several occa-
sions, he, afterwards, prescribed for Rice, but never mercury.
He describes him as an old and weak man, with slow action of
the heart and with dropsy of his lower extremities. His ex-
amination of him resulted in finding the kidneys, liver, spleen
and lungs in good condition. In September he examined him
daily. His heart, though weak, was sound and his digestion
was good. He knew that the defendant was engaged as oppos-
ing counsel in Rice's suit against Holt, and he corroborated
Jones' statement about his being cautioned against mentioning
the defendant's name in Rice's presence. The burning of an
oil mill in Texas, in the early part of September, had much
affected Rice and, about September 21st, he observed that his
respiration became oppressed; a result which he attributed to
mental worry. On September 22d, the day before his death,

the witness called in the afternoon and found him up, but quite weak. He recommended to Jones to keep him quiet, because of his mental condition, and he would recover; though the worst might happen. Sunday morning Rice described himself to the witness as feeling better. He had, then, a pulse of 60 and a normal temperature. the witness did not like the breathing; but, upon examining the lungs, found nothing the matter with them. When summoned that evening by Jones, he observed the features to be calm and natural, as though death had happened without a struggle. He could detect no odor of chloroform upon the body; though his examination was closely made. He thought he should have detected it, had only a half to three-quarters of an hour elapsed since its administration; although he says that the cases where he had noticed the odor were those of operations in which the patient, by breathing the chloroform in and out, had saturated the room. He stated that, if chloroform was administered in the manner that Jones had described, it would have killed Rice within four or five minutes, or " it might have taken half an hour." He thought the diarrhoea had contributed to the death, by enfeebling the body and nerve force. He denied any conversation with Jones, or the defendant, about the operation of chloroform; or as to the latter's having made any promise about fees. Mrs. Carpenter, a friend of Rice, testified to having once seen him and the defendant together in May, 1900; to his having once expressed a desire to be cremated; and, when she saw him on Saturday before his death, to his appearing as if " struck with death." Meyers, who was in the defendant's office, testified to having gone to the apartment of the deceased, at times, by the defendant's direction, to take, as notary public, Rice's acknowledgment and that, when he was sent up with some papers, for such a purpose, on June 30th, the will in question was produced by Rice and the request was made to him and to his companion, Short, to witness it. They complied and his testimony to the formalities

of execution was given quite fully. He said he had worked for some time upon drafts of a will for Rice which had been furnished him by the defendant. He knew of no business relations of the defendant with the deceased. Short, a friend of the defendant, who had always accompanied Meyers upon the occasions of his being sent to Rice's rooms, testified to the same effect as had Meyers, with respect to witnessing the will of 1900, and, also, to a request by the deceased that it should not be spoken of until after his death. He accompanied Meyers, in the capacity of a commissioner of deeds for Texas, to take acknowledgments upon documents to be recorded in that State. It was made to appear that the defendant knew that a notary public's certificate was sufficient and the Texas statutes were, also, put in evidence to establish the fact. Miss Potts and others, of the household where the defendant had his residence, were called to establish the fact of the defendant's absence from Rice's apartment during the early part of the evening of Sunday.

At the conclusion of the case, the counsel for the defendant stated that " it was due to the court to say that the defense has no complaint to make" and that the court had exercised much indulgence to their side of the case. This was quite true and the court might well have been more strict in limiting the examinations of witnesses. The charge to the jury was, apparently, so fair as to provoke but two unimportant exceptions; one of which was obviated by charging to the effect requested; while the other related to a comment on Jones' testimony, which the court sufficiently obviated by leaving it to the recollection of the jury. The charge was, in fact, absolutely fair in its statement of facts and in its instructions as to the rules of law. The court submitted to the jury as propositions, to be established beyond a reasonable doubt, the following:

" I. That on the 23d day of September, 1900, Charles F. Jones, with intent to kill, placed a towel, wrapped in the form

of a cone, containing a sponge saturated with chloroform, upon the face of William M. Rice;

" II. That William M. Rice died from the effects of chloroform and from no other cause, and

" III. That the defendant, with intent to procure the death of William M. Rice, aided, abetted, counselled, advised, or procured Jones to kill him."

The jury rendered a verdict of guilty, as charged, and, in my opinion, no other verdict could have been reached, upon a dispassionate and intelligent consideration of the evidence.

The great mass of evidence and the earnestness with which the very eminent counsel for the People and for the defendant have argued from it, for and against the result of the trial, have seemed to me to render necessary this somewhat extended discussion. The prosecution was attended with the difficulty of the situation. The deceased had led a comparatively isolated life in the community. The accused was a lawyer, who, for months, was preparing his plans in such a manner as might divert suspicion of the use of foul means. He secured a useful tool in the faithless servant, through whom he acquired the secrets of his master and was enabled to mature his plans. When ripe for fruition, the tool was there, through whom they might be executed. I think that the verdict rested upon satisfactory evidence of the truthfulness of Jones' story and of the connection of the defendant from the inception to the close of the conspiracy disclosed. The jurors were warranted in believing that death was caused by chloroform poisoning and that certain material facts, sworn to by witnesses, other than Jones, taken by themselves, led irresistibly to the one inference that the defendant's was the mind which had conceived the criminal act and induced its commission. The evidence, independently of the testimony of the accomplice, is fraught with a crushing implication of the defendant in the deliberate purpose to kill Rice, in order that he might possess his estate.

Coming from the same State, he knew of Rice's large possessions. He finds him living with Jones, his only attendant, in a most retired manner. He makes Jones' acquaintance; gains a sinister influence over him; informs himself about the affairs of Rice; induces Jones to enter into the scheme of forging, or forcing, a new will upon Rice, by which he, the defendant, not only a stranger, but one of the counsel engaged in opposing Rice in a bitter family litigation, is to benefit, as residuary legatee. He induces Jones to forge letters from the deceased to him, which will furnish evidence, later, of the establishment of friendly relations and of his having gained his confidence. With Jones' aid transfers to him of Rice's moneys and securities, in banks and in safe deposit vaults, are forged, shortly before the death and after the forging of the will; with the only conceivable object of, either, showing a boundless trust reposed in him, or of fortifying his position in the event of litigation. He gets Jones, in addition, to prepare a general assignment to him of all Rice's real and personal estate upon the agreement to pay $10,000 a year during the latter's life. He causes Jones to introduce his friend, the physician, to Rice, under strict injunctions not to mention his name before him. An effort is made to break down the old man's system, naturally healthful, by administering mercury, in the hope that death might ensue. This design fails; the intended victim rallies and so improves as to promise a continuance of life. On the Sunday, when the murder was committed, the two found themselves in a situation, where the first of a series of drafts for the payment of some $250,000, promised for the reconstruction of the Texas mill property, had been presented, and its payment put off till Monday. Baker, the personal friend and counsel of the deceased, was soon expected to arrive. Delay would endanger the success of their plans and it was resolved to remove the obstacle in the way. Jones was, plainly, the one to do the

VOL. XIX.—12

killing. He would not be suspected, as no motive would be apparent for the killing; while the defendant's interest was such as would, inevitably, fasten suspicion upon him, if he could be traced to the deceased's apartment. He had oxalic acid in his office and procures it for Jones to administer in the afternoon; but the victim could not be persuaded to drink it. Then the bottle of chloroform was given to Jones and, in the evening, while asleep, its contents were used upon Rice with success. Within an hour, the defendant appears and, when the undertaker arrives, he directs the remains to be cremated. He orders the embalming, when told that twenty-four hours must elapse before cremation would be possible. He carries off, that night, all that was of value in securities and moneys. Early in the following morning, he brings to Jones, and has him fill out, the four checks, which the latter had drawn to his order and which purported to have been signed by the deceased, in various amounts aggregating $250,000. He endeavors to obtain the money, early that morning, upon one drawn upon Swenson & Sons; but fails, because of the error of Jones in misspelling his name. This causes delay, results in the banker's learning of the death of his depositor and leads to investigations, which result in the arrest of the two. On the morning after the death he produces the letter, purporting to be from the deceased to him and directing the cremation of his remains, and instructs the undertaker to arrange for it on Tuesday. He procures one of the checks for $25,000 to be cashed. He tells Maria Scott, the chore woman, with no apparent relevancy to what had happened, that she is suspected of having poisoned the deceased. Late in the night of Monday he is found by the janitor of his office building destroying papers. To several persons, within the next few days, he tells irreconcilable stories to account for the checks he had sought to use and for his large interest in the estate of the deceased. He professes to some to have had secret relations with the deceased of an extraordinarily intimate and

confidential nature.   He telegraphs to Holt a copy of an agree-
ment, purporting to have been made months before, which set-
tled the will litigation by Rice's payment to Holt of $250,000,
to be made upon his death.   Corroboration of material facts in
Jones' testimony was not wanting.   The defendant's frequent
association with Jones was proved by others, as was the fact
of his being a comparative stranger to Rice.   Wetherbee cor-
roborated Jones' statement about the proposed will, which
Jones was to get the deceased to sign in an unguarded moment.
The preparation of a will at defendant's office, from drafts
furnished by him, was proved by his clerk; as was the intro-
duction of the clerk and of the defendant's friend to Rice to
qualify them as witnesses.   The list of dates, furnished by de-
fendant for the mailing of envelopes by Jones, in which to in-
sert the letters purporting to come from Rice to him, was pro-
duced in evidence and the receipt of the envelopes bearing the
" return card " of the deceased was proved.   The advertisement
ruse, resorted to by defendant in order to come into relations
with Rice, was testified to by Baker.   The assignments to de-
fendant and the checks to his order were seen by Potts shortly
before the death.   Jones' brother testified to sending on the
chloroform.   That telephonic communication was had between
the residence of the defendant and of Jones, between six and
seven o'clock, on Sunday evening, was proved.   That the defend-
ant did not know the deceased, or have any intercourse with
him, as Jones had testified, was an irresistible inference from
the other evidence.   Certainly the defendant adduced no evi-
dence of any intimacy and Dr. Curry corroborates Jones' state-
ment that defendant's name was not to be mentioned.

There was enough in corroboration of Jones and when, in
connection with his story and with other evidence of facts and
circumstances, we consider the defendant's prompt appearance
upon the scene of the murder, his appropriation of the securi-
ties and moneys in the apartment, his efforts to realize upon the

forged checks and his extraordinary and unnatural attempt to have the body promptly cremated, the jury might well consider the criminal agency to have been proved beyond a reasonable doubt. The point was to establish Jones in the confidence of the jury as a witness. That was evidently accomplished. The jurors could infer the guilty connection of the two from the circumstances referred to. The checks, of themselves, filled out in the handwriting of Jones and indorsed by the defendant, were some evidence of a conspiracy, and if the jury believed the signatures to have been forged, the evidence was conclusive in its nature as to the fact. What motive could Jones have had to fabricate this story of the crime? The jury might believe that he abandoned his false statements, when shown that the evidence would not piece together in a credible whole.

What was necessary to complete the picture of this crime, planned by the defendant and procured by him to be committed upon the solitary old man, who was too slow in paying his final debt to nature to suit the plans of the conspirators? Not his presence; for the statute says that that is not necessary in order to implicate him. He was not in the room, nor in the building. He was awaiting the signal from his confederate and then appears; not too promptly, but with his friend Dr. Curry. In the eye of the law, he had been there in the person of his accomplice; the miserable tool, whom he had fashioned for his purposes and had induced to do the killing.

In my opinion, justice does not demand that the defendant should have a new trial; unless errors were committed upon this trial in the rulings of the court, or in the charge to the jury, which affected some substantial right of the accused. I shall discuss some of those which his counsel has presented in his argument. Defendant complains of the court's action in compelling him to alter the phrasing of a hypothetical question to Dr. Lee, a medical expert called for the defense, as to

the cause of death, under conditions supposed. The question, in resuming the conditions existing prior to death, assumed a congestion of the lungs " that was not exactly co-extensive " and the court ruled that the testimony upon the subject by the physicians had been that the congestion was co-extensive. The supposed condition had reference to Dr. Donlin's testimony, one of the coroner's physicians, and, upon referring to it, we find that, while he did not use the word " co-extensive," he testified that he " found the lungs congested extensively " and, again, that the congestion extended " all over both lungs." Had the court permitted the question to stand, it would not, in the respect mentioned, have been in real, or in substantial, accord with the facts testified to and the jury might have been confused, if not misled. Questions of a hypothetical nature put to experts for their opinion upon a state of facts, which shall aid the jurors in reaching a determination upon the issue before them, must, necessarily, be based upon facts either admitted, or which are in conflict upon the evidence. (Wharton's Crim. Evid., § 418; Cowley v. People, 83 N. Y., at p. 470; People v. Harris, 136 id., at p. 453, 10 N. Y. Crim. 260, 285.) Here, the only testimony as to the condition of the lungs after death was given by the coroner's physicians, who had performed the autopsy, and by Professor Witthaus, and it was upon such evidence that the prosecution was relying. The jurors were to weigh in the mental scale their testimony, with other relevant facts. Hence, the question to the expert, for not stating a fact of the autopsy, as to which there was no conflict, was properly objected to. It is clear, beyond cavil, that, if Dr. Donlin was to be believed, he found a congestion of the lungs, which was complete as to the organ; whether it was termed " co-extensive with," or " all over both," the lungs. Under the circumstances, counsel were not at liberty to assume as a fact, in their question to the medical expert, that which had no support in the testimony. Defendant assigns error in

the exclusion of conversations between the witness Adams and the deceased, whose intimate acquaintance he was. Upon his examination by the defendant, it was sought to have him state what had been said by the deceased on the subject of crematation, in conversation. The trial court ruled it out as hearsay. I think there was no error in the exclusion, prejudicial to the defendant; for, assuming that the deceased had expressed himself as being in favor of cremation, how would that be material, or relevant, as establishing the genuineness of the supposed letter from him to the defendant; which the latter had with him, on the morning after the death? What was in question was whether, as part of the scheme to obtain the property of Rice, the defendant had forged the latter's name to a letter to him upon the subject of cremation. If it were true that the defendant had learned of expressions of preference by Rice for such a disposition of the dead body, that would, at most, suggest a reason for the defendant's fabricating the letter, through the use of which he might ensure the destruction of bodily evidences of a homicide. I am unable to perceive the competency of the evidence of these oral declarations of the deceased to a third person upon the question of the genuineness of the cremation letter. The prosecution had not introduced the subject upon the direct examination. It was not offered by the defendant to disprove the forgery by him of the cremation letter, but, only, to show the views of the deceased.

Exception was taken to the admission in evidence of Jones' attempt at suicide, because of its incompetency, either, to corroborate his confession, or to affect the defendant. I think that it was properly admitted, under the circumstances of the case, as bearing upon the history of Jones' career, from his first meeting with the defendant down to his testimony upon the trial as to the elaboration of the scheme to obtain the property of Rice and as to their joint intention to consum-

mate it by a murder. It tended, at least, to show the continuance of the conspiracy, into which Jones and the defendant had entered. It was the claim of the prosecution that the defendant was privy to the attempt, in the hope of destroying proof of his guilt. It bore upon the credibility of Jones in testifying that the defendant had advised their jointly committing suicide and had furnished him a knife for the purpose. Defendant's counsel conceded its admissibility if the act was in furtherance of the conspiracy.

It is argued that an error was committed in permitting Jones to testify to conversations at interviews, when he, the defendant and Mr. House, their counsel, or Mr. Martin, Mr. House's assistant, were together. In the first place, the portions of the record pointed out in the brief show, either that the relation of counsel had not been shown to exist, or that the conversation was conducted between the defendant and Jones, so as not to be overheard by Mr. House; or that the objection was too general. As matter of fact, the court excluded so much of the testimony of Jones as was offered to prove admissions on the part of the defendant. When at a subsequent stage of the examination, Jones was allowed to testify to having told Mr. House of his having chloroformed the deceased, it was after he had been made to testify, on his cross-examination, to having made false statements concerning the death. It was, therefore, no error to allow the prosecution to show by him that, at a date prior to his statements to the district attorney, he had told Mr. House of his having administered the chloroform. Furthermore, under the provisions of the Code, relating to privileged communications between attorney and client (Code Civ. Proc., secs. 835, 836), the privilege is the client's and when Jones volunteered his testimony in the case, it was, necessarily, equivalent to an express waiver on his part, in open court, of any privilege accorded by the statute. It was the expression of a desire to reveal everything within his knowl-

edge, touching his criminal conduct. But Jones was only allowed to testify to the fact that he had told his counsel of his own guilt. In the eye of the law, Jones and the defendant were distinct personalities, although connected in a scheme to commit a crime. To permit the extension of the defendant's privilege to invoke the statutory prohibition as to communications between himself and counsel, so as to exclude Jones' statements to the same counsel, acting for him, would be to stretch the statute beyond the demands of public policy.

Error is assigned in the exclusion of the testimony of one Trendley, an expert in handwriting, and our decision in the case of Hoag v. Wright (174 N. Y. 36), is invoked by the appellant; a decision rendered since the trial of this case. In that case, an expert in handwriting had testified to the genuineness of signatures after making comparisons with certain standards, and it was held to be competent, upon cross-examination, to test the value of his opinion by submitting spurious signatures to him and by then asking him if he had not, upon a previous trial, after comparisons, pronounced them to have been written by the same hand that wrote the genuine signatures. In this case, Harmon had been examined as a witness for the prosecution. He had been for many years a clerk with Swenson & Sons, the bankers of the deceased. He knew the deceased and had a familiarity with his handwriting, from seeing him write and from handling his checks. He had testified to the spuriousness of signatures of the deceased upon the disputed instruments. The defendant submitted to him certain signatures, purporting to be by the deceased, which were visible only through slits, or openings, made in envelopes, and he pronounced his opinion upon them. One of the signatures, which he had pronounced genuine, had been written, inferentially, by an expert in handwriting. Being called as a witness, this expert was shown the signature, but without the envelope, and he was not allowed to testify

about it, or to the effect that he had written it. The court ruled that it was unfair, when Harmon had only seen the signature through an aperture, that Trendley should be allowed to pass upon it, aided by the knowledge that it was upon a blank sheet of paper and, therefore, not a genuine one, but presumably, one of his own making. It was, obviously, an unfair test and the court did not abuse its discretionary power in the cross-examination. It is to be observed that Harmon was called upon to testify, by reason of his competency to form an opinion from long acquaintance with the handwriting of the deceased and not by reason of his being a professional expert in handwriting, or penmanship. I think the question is distinguishable, upon the facts, from that passed upon in Hoag v. Wright; but were it to be considered as controlled by that case, then the error must be regarded as of negligible importance, in view of the mass of expert evidence admitted upon the subject. The defendant could not have been prejudiced; for, clearly, the jury could not but infer, from the questions and the discussion, that the purpose of the defendant was to prove that Harmon had made a mistake in undertaking to testify from comparisons of signatures.

Further discussion of the errors assigned by the defendant is needless. That some of the rulings of the recorder were erroneous may be conceded; but none, in my opinion, was of sufficient gravity to justify us in reversing the judgment of conviction. The evidence conclusively established the defendant's guilt and led to the verdict rendered, and, therefore, under the command of section 542 of the Code of Criminal Procedure, we should give judgment, without regard to technical errors, or to exceptions which do not affect any substantial right of the defendant.

After the entry of judgment, the defendant moved the court for an order granting a new trial, upon affidavits' alleging that evidence had been newly discovered, which would have changed

the verdict. In addition to the affidavits, there was an oral examination of the affiants before the recorder and the defendant claims that facts appeared which would show that complete immunity had been accorded to defendant's accomplice, Jones; that Doctors Donlin and Williams, who testified concerning the autopsy, had stated to others, after the autopsy, that death had resulted from old age and that no suspicious cause of death had been revealed; that they had been paid by the county for their services to the prosecution in preparing themselves as medical witnesses for the trial and that there was an intimate connection between the proponents of the genuine will of 1896 and the prosecution of the defendant. These allegations, or statements, were met by denials, or explanations, and, upon a consideration of the moving papers and the evidence, the recorder refused to order a new trial. In an opinion,* he observed that there was no proof of any evidence of a material character having been newly discovered since the trial; that substantially all the matters and conditions now claimed to have been newly discovered were within the knowledge of one, or all, of the counsel for the defendant from the inception of the criminal charge and that the cross-examination of the witnesses for the prosecution indicated the possession of knowledge, or that it could have been acquired by use of the opportunities afforded. In this I think that he was quite right. In all of this voluminous part of the record, I find nothing which, if true, was either entitled to be regarded as newly-discovered evidence, or, if it might be so regarded, went further than to affect the credibility of Jones, or of the medical, or other, witnesses. As to Jones, and the argument is based, mainly upon his alleged immunity from prosecution, he, already, stood before the jury as a self-confessed murderer, who had told contradictory stories of the affair and who was not being tried for the crime. It appeared how Jones came, eventually, to make the confession of the facts, which were disclosed in his testi-

---

* See *ante*, p. 134.

mony at the trial, and the jurors had enough of the circumstances before them, with which to weigh his credibility. Furthermore, what is the materiality of the fact that immunity may have been promised him, when his story had to be corroborated by other evidence connecting the defendant with the crime? As to the physicians, Donlin and Williams, it appeared that one of the defendant's counsel knew of Dr. Williams having been at work for the prosecution; but he did not know it was to be paid for. Both physicians presented bills for their services in preparation for, and upon, the trial, which were reduced in amount, at the instance of the district attorney's office, and, as reduced, paid by the People. I am unable to perceive the materiality of this fact upon the application for a new trial. The prosecution had the right to employ the services of these physicians to testify as medical experts, in addition to having them testify to the facts of the autopsy. If their services could not, legally, be compensated for, then, it was a matter for the public authorities to inquire into. Dr. Donlin, specifically, denied any conversation wth Dr. Williams, in which either had stated that death was due to old age. Their evidence as to the facts revealed by the autopsy was one step in the prosecution; while their opinions as to what the appearance of the vital organs indicated as the cause of death made another step. Their testimony, in the latter respect, was entitled to such force, as the jury chose to give to it, upon considering, with the circumstances attending their appearance as witnesses, their experience and the effect of cross-examination upon their statements.

Whether a new trial should be granted to the defendant was a matter within the discretion of the trial court, with the fair exercise of which this court will, and should, not interfere. (Code Crim. Proc., sec. 465, sub. 7, and sec. 466; People v. Buchanan, 145 N. Y. 1, 30, 9 N. Y. Crim. 428, 451; People v. Priori, 164 id. 459, 472, 15 N. Y. Crim. 194, 206.)

There was no hasty trial and conviction; for the trial occupied ten court weeks and the record fills some 3,000 pages, exclusive of the proceedings upon the application for a new trial. It cannot, fairly, be said that the recorder was lacking in indulgence to the defendant in his rulings and it is not claimed that his charge to the jury was either unfair or erroneous. So great was the latitude of inquiry allowed upon the application for a new trial that its matter, alone, fills a separate volume of some 1,100 pages. An appeal is not a matter of inherent right; it is one extended to a defendant by the favor of the state. Much must be left to the exercise of the discretion of the court, in which the trial is had, and interference by this court only becomes justifiable where there has been so clear an abuse of that discretion that we can say that the defendant did not have a fair trial.

In my judgment, the evidence upon which the new trial is demanded would not change the result. It is largely cumulative in its nature and tends, principally, to contradict the former evidence. (See People v. Priori, *supra*.)

I think no other questions demand our consideration and I find no satisfactory reason for reversing the judgment of conviction.

O'BRIEN, J. (dissenting): At the outset of this opinion I shall assume, as I have a right to assume, that all that is to be or can be said in support of this judgment is to be found in the able and elaborate opinion of Judge GRAY. On carefully reading and considering that opinion, my first impression was to record my vote in silence against its conclusion. I confess that this resolve was based upon the desire to avoid the severe and sometimes useless labor that the other course would involve. But on further reflection I have concluded that there is so much to be said about this case that has not yet been said, and so many things to be revealed that are still obscure or not given that prominence that they deserve, that I ought to state

a few of the objections, at least, upon which my views of the case are based. While I may run the risk of being charged with prolixity, I hope to be able to throw some additional light on the case, and prolixity ought not to be imputed to a reasonable and thorough discussion of a case in which a human life is involved.

The defendant, through his counsel, has presented to this court various legal objections to the judgment against him that, in my opinion, involve questions of the gravest character. They cannot and ought not to be silently ignored or met by general assertions, or answered by arguments that may be specious, but are far from conclusive. They should be met and answered, if they can be, by arguments so fair and solid as to convince any fair mind, whether that of a lawyer or layman, that they are untenable. If they cannot be answered in that way, the objections ought to prevail, whatever we may think about the guilt or innocence of the defendant.

The crime of which the defendant was convicted is that he advised or procured another to commit murder, and, therefore, under the law now existing, is a principal just the same as if he had committed the deed with his own hand. Formerly the charge stated in the indictment would constitute the defendant only an accessory before the fact, and he could not be tried or convicted until the principal was first convicted. Now the accessory may be tried as a principal, while the real principal may go free, as this case well illustrates. No review of this case will be adequate that does not give a prominent place to certain general features that must at once attract attention and serve to guard the mind against all superficial views or hasty conclusions.

The first thing that ought to be noticed and ought to receive the most careful attention is the character of the proof of the *corpus delicti*.

It is a fundamental principle of the criminal law that before any one can be convicted of murder or manslaughter it must be clearly proved that the death of the subject of the alleged crime was caused by a felonious act. The primary question upon this appeal is whether the death of William M. Rice was the result of a crime, and evidence of motive, however strong, cannot establish that essential fact. Death by criminal agency is the body of the crime in all prosecutions for homicide, and at the threshold the burden is upon the People to prove beyond a reasonable doubt that one human being has been feloniously killed by another human being. The death of William M. Rice is admitted, but the allegation that his life was taken by criminal violence is strenuously denied. The fact, if it is a fact, that the defendant hoped he would die and was prepared to seize his vast estate by forgery and fraud if he should die, has no bearing upon the question which overreaches all others, whether he actually died a violent death. Let us look at the evidence, not in search of a victim, but to find the truth.

Mr. Rice was a feeble old man in the eighty-fifth year of his life. His general health had been pretty good for one so far advanced in life until a short time before his death, when he ate so imprudently of bananas that he became dangerously sick and was relieved by a violent purgative. This weakened him and he never recovered his strength. Dr. Curry, his physician, was anxious about him and was in daily attendance upon him. While he thought he would recover, he declared that a little thing would carry him off and that the worst might be expected at any moment. The death occurred on Sunday afternoon and the day before Mr. Rice was delirious much of the time. He was delirious very early Sunday morning and in the afternoon showed signs of mental wandering. He was last seen alive by Charles F. Jones, his valet, who says he left him sleeping on the bed when he went out to a restaurant. It was not proved that any one saw him alive after that. Jones

was gone about forty minutes and on his return Mr. Rice was lying in the same position as before. He had not moved a muscle so far as Jones observed. Jones believed he was alive, but he could not swear that he was alive. He saw no sign of life. He did not see him move or breathe and did not know but what he was then dead. Believing that he was alive he tried to kill him. With murder in his heart, he did all he could to compass his death, but he did not know and no one ever can know whether he acted upon a living man or a corpse. He saturated a sponge with two ounces of chloroform, put it in a cone made out of a towel, placed the cone over the mouth and nose of the body before him and left the room. When he came back thirty minutes later the cone was in the same position as he left it. The body had not moved. The effort of nature to shrink from the pungent odor, the rebellion of the lungs against the poisonous fumes and even the struggle of death had not caused a movement sufficient to disturb the cone. The unnatural gas with its strong odor had entered the lungs and done its work so quietly as not to awaken the sleeping victim. Is this to be believed? Can it be believed with safety upon the word of such a creature as Jones confessed himself to be? So far as we know and so far as Jones knows he might as well have placed the cone upon a face of marble.

In about twenty minutes Dr. Curry was there. He examined the body with care. He put his face over the heart to hear it beat and although his nose was within six inches of the full beard of Mr. Rice, which must have been saturated with the drug but a few moments before, no suggestion of chloroform came to him. He noticed no smell of chloroform in the room. Jones had raised the windows, as he says, and ventilated the room before Dr. Curry came and had thus, as he claims, removed the penetrating odor so completely that an experienced physician could detect no trace of it. Jones also claims that before Dr. Curry came he went to the range and

burned the sponge and towel with a match and "they flashed up," as he says, although science says that they did not and could not under the circumstances stated by him. The undertaker and the embalmer came, but during their close contact with the body they observed no odor of chloroform. The use of that drug as the agency of death occurred to no one until Jones had made his fourth and last confession, after he had recanted three others as they were successively demonstrated to be false.

Dr. Curry certified to death from natural causes and the mental worry referred to by him in his certificate tallied well with the facts, for Mr. Rice had been subjected to great anxiety owing to litigation which involved a large part of his estate and a recent fire which resulted in the loss of a quarter of a million. The body was embalmed by injecting through powerful hydraulic pressure a fluid into the arteries which penetrated far and wide. About forty-three hours after the death an official autopsy was made, and the physicians who opened the body removed the vital organs and searched for the cause of death, found no odor of chloroform, but they found embalming fluid almost everywhere. While their suspicions suggested poisoning and they turned portions of the body over to chemists for analysis, which when made disclosed no poison, the theory of death from chloroform did not occur to them. That theory was advanced by no one, physician or layman, until a long time afterward, when Jones made his last confession, which involved the falsity of three others; then it was too late to tell with reasonable certainty whether it was the true theory or not, for the body had been cremated and further investigation was impossible.

The most careful examination of the lungs is required in order to tell whether death has been caused by chloroform poisoning or poisoning from any kind of irritating gas. The lungs of Mr. Rice were examined in the most casual, not to

say careless, way. They were removed, a couple of transverse cuts made and were then cast aside, although every other vital organ received careful attention. The physicians were looking for evidence of death by criminal agency, but not expecting to find it in the lungs they gave them only a perfunctory examination. They could not swear to the proximate cause of death and did not. Where the most minute investigation was needed, none was made. They did not know whether the embalming fluid had reached the lungs, although they had theories upon the subject. Where certainty was req˙ ˙red, there was serious doubt, with a man's life trembling in the balance.

After reading all the evidence upon the subject, I think it cannot be safely held that the autopsy was thorough enough, or that the lungs were examined with care enough to warrant the conclusion that the death was caused by chloroform. If an overwhelming motive had not been shown, no judge would have sent the case to a jury, yet motive does not even tend to establish the cause of death. The law requires that the inference of death from criminal agency must be the only reasonable deduction from the evidence. The People did not meet the burden of proof cast upon them of showing beyond a reasonable doubt that the death of Rice was caused by a crime. It is claimed that he was killed by the administration of chloroform, and no other criminal agency is now suggested, but that agency rests upon too frail a basis to permit the verdict to stand with safety to society. The man who says he committed the murder is suffered to go free, with no attempt to punish or even to prosecute him. The coroner's physicians who made the autopsy and were presented to the jury as disinterested officials, were shown upon the motion for a new trial to have been working hard by experiment and otherwise to help the district attorney make out a case, in the expectation of receiving extravagant compensation for their efforts to qualify them-

selves as experts.  Disinterested experiments made to discover truth are useful, but experiments made and paid for to establish a theory are dangerous.  The case was tried in an atmosphere charged with the necessity of making the defendant a victim in order to defeat his claim to an estate worth millions upon millions.  The self-confessed murderer was released, the doctors had their money, but the jury did not know that each of these three most important witnesses was testifying against the defendant with a strong inducement to help make out a case against him.

This judgment rests upon the testimony of three witnesses. Without their testimony no court would feel justified in submitting the case to the jury.  We must, therefore, take a little closer view of them and of the motives that may fairly be imputed to them.  Jones was evidently testifying under a promise of immunity from the public prosecutor, and although he denied that as a witness upon the stand, no fair man can doubt, from the circumstances, that such a promise was made.  Although he appeared before the grand jury as a confessed murderer, yet that body found no indictment against him, thus violating in the plainest way their statutory duty.  No one can believe that that body would have omitted to indict him except upon the advice or suggestion of the public prosecutor.  He was set at large and maintained at the public expense in the hospital, and subsequently in a comfortable, if not fashionable, boarding house, where he had the freedom of the city, attending theatres and places of public amusement until the trial of this case, when, having earned his reward, he was allowed to depart to his native State of Texas, where he now resides in safety.  No fair mind can reach any conclusion from these facts except that this accomplice and author of the crime testified under a promise of immunity.

The two other witnesses were public officers, having been appointed physicians to the coroner.  In that capacity they

were receiving a good round salary, to which they had the undoubted right. I have already shown that at the autopsy they found nothing in the appearance of the lungs or in any other part of the body that indicated death from chloroform, but when Jones, in the course of time, had prepared his fourth version of the facts bearing upon the cause of death, they set to work to find, either by the use of their memories as to what the autopsy had disclosed, or by experiments which will be alluded to hereafter, something to corroborate it. One of them tells us that he spent a year making these experiments, and they were wide enough to embrace one hundred and forty specimens of birds and animals. All this time he was working for pay, although he was a salaried official. He presented a bill to the city for seven thousand five hundred dollars, which he claimed was the value of his services. He was actually paid five thousand two hundred dollars, as he says, for working up the case. The other physician, who was also under a salary, presented a bill not so large, which was paid. These facts were not known at the time of the trial, and these witnesses were presented to the jury as public officials with no motive to pervert the truth, but acting in the course of their duty in the maintenance of truth and in the cause of justice. The whole point and value of the testimony of these witnesses is that they attempted to prove, and it is said that they did prove, that the lungs of the dead man were found to be congested and that congestion was a sure indication that his death was produced by chloroform. There was absolutely no other point to the testimony given by them, except to show that there was at least some congestion of the lungs at the autopsy and that from their professional experience and their experiments upon birds and animals that congestion was proof of chloroform poisoning.

So, we have a case where the three principal witnesses for the People, clearly the witnesses that produced the conviction, were testifying at the trial for great prizes and great rewards.

The reward which Jones expected and received was nothing else than his life, and what will not a man give for that? The two physicians testified with the expectation of receiving large rewards in money and they were not disappointed. We may assume also that their minds were affected by that pride of opinion and that kind of mental fascination with which men are affected when engaged in the pursuit of what they call scientific inquiries. There is no proof whatever to corroborate Jones upon the most vital fact to which he testified and that was that he purchased chloroform and administered it to the deceased at the command and request of the defendant. The evidence of corroboration is directed entirely to other matters which seem to me to be largely collateral. He is corroborated as to the numerous forgeries with which he and the defendant were connected, and which, it is claimed, furnish the motive for killing the deceased. But corroboration of the informer as to things that furnish motive and as to collateral facts, does not meet the difficulty of the absence of all proof that he was advised or requested by the defendant to administer chloroform to the deceased. In all cases of death by poisoning it is of the utmost importance that traces of the poison be found, by chemical analysis, to exist in the body of the deceased. In the present case no trace of poison by irritant gas or otherwise was found by a chemical analysis or in any other way in the body of Rice, and the real foundation for the contention that chloroform was the cause of death, aside from the testimony of Jones, rests upon the alleged congestion of the lungs.

I intend to cast no reflections upon any one. All I mean to say is what every reasonable man has the right to say, and that is that a judgment of conviction in a capital case that rests upon such an uncertain and frail foundation and is affected with such dangerous and suspicious elements of doubt should be subjected to the most rigid scrutiny and not permitted to stand, unless every rule of law that could have been of any advantage

to the accused was observed at the trial. My objection to the judgment in this case is that the accused has not had a fair and impartial trial. I am aware that I have no right to say that unless the assertion can be sustained by facts and arguments that must appeal, not only to the judgment and common sense of the bench and the bar, but to every fair mind, whether lawyer or layman, who has a proper respect for the orderly administration of justice, and intelligence enough to discern the significance of the facts and the force of the argument.

I hope to be able to meet all the burden in that regard that I have assumed and I will not deal much with generalities, but with specific questions, stating the law and the facts involved in the several questions as they appear to me and as they are found in the record. Nor do I propose to deal with any questions that have not been raised by exceptions. While exceptions are not necessary to raise any question in this court fairly disclosed by the record in a capital case, I prefer to confine myself to those questions plainly presented and deliberately decided. In my opinion, the rules of evidence in criminal cases were ignored or violated at the trial to the prejudice of the accused. Nothing can be of more importance to a party on trial for a criminal charge than the observance of these rules, and this court, as will be shown hereafter, has steadily refused to relax them. The principles of the law of evidence that govern all criminal trials are, as Lord ERSKINE once observed, "founded in the charities of religion, in the philosophy of nature, in the truths of history and in the experience of common life." (24 Howell's St. Tr. 966.) And that remark has been fully approved and liberally quoted by modern authorities on that branch of the law.

1. Among the numerous conferences between Jones, the accomplice and informer, and the public prosecutor, at least one of them is very significant. Jones had then given at least three

different and conflicting statements concerning the manner in which the death of Rice was produced, some, if not all of them, under oath. These statements purport to detail the circumstances of the homicide, the parties concerned and the cause of death. They were not satisfactory and he was told, in substance, that no statement would be accepted from him unless it could be corroborated. In these conferences there was doubtless a good deal said that savored of casuistry, and it is evident that on both sides words were used to conceal thoughts, but the learned district attorney laid down one principle, and that was that the truth was always consistent and could always be corroborated. It would perhaps have been more correct to say that truth, as such, never needs corroboration. It is something that is either false in fact or in the eye of the law that needs corroboration. The sun needs no exterior aid in diffusing light and heat over the world. But whatever Jones understood by the remark he set to work to comply with the suggestion. He was aided by his private counsel, who was at all times *persona grata* at the office of the district attorney. It took a long time between them all to construct the statement, and it was not until several months after the homicide that it was ready to submit to the grand jury in the form that we now have it in the record. The corroboration of Jones seems to have been, as it certainly was, a vexatious question that was always uppermost in the mind of the public prosecutor, and hence many novel and ingenious methods were adopted for that purpose at the trial. One of the methods thus adopted was to prove by Jones himself that while in jail he had made an unsuccessful attempt to commit suicide.

The foundation for this evidence was a claim on the part of the People that the defendant and the accomplice, when in jail, had formed a conspiracy to commit suicide. It was, of course, a novel application of the law of conspiracy, but it was thought to be a sound proposition that a conspiracy between

these two persons to commit suicide after the homicide proved in some way an antecedent conspiracy to kill Rice. The People proved by the accomplice, who was evidently ready to testify to anything, that there was some talk between himself and the defendant in regard to suicide, and then the scene was opened by the following question propounded by the People to the accomplice: " What did you do to yourself *in furtherance of the common purpose?*"   The witness then proceeded to relate the details of his unsuccessful attempt, which consisted, as he said, of the attempt to cut his throat with a knife. The stabs and gashes that he made with the knife seemed to have been carefully noted, and he fixes the number at about a dozen. Even the knife was produced and handed by the district attorney to the jury, with the remark, " Let them look at it *while the blood is on it.*" It was more than a year from the date of this alleged attempt at self-destruction to the enactment of the scene in the court room. Where the knife had been in the meantime, or who had it in charge does not appear, but it must have been very carefully preserved if the jury could, without any evidence except their own senses, have seen the blood upon it.

Whether this attempt at suicide was real or feigned no one, of course, can tell except the informer himself. It is quite certain, however, that the immediate results were that he regained his liberty, since he was taken to the hospital and there carefully nursed, and subsequently to the boarding house I have mentioned, where he had the freedom of the city, so to speak, and after the trial departed for his old home.

Of course the accomplice could not corroborate himself by any act, statement, admission or device of his own. We have seen already how the learned district attorney impressed upon his mind the importance of corroboration, and if the accomplice, situated as he was, could corroborate himself by any feigned or unsuccessful attempt at suicide, this would practically abolish the statute which enacts that no conviction is

possible upon the uncorroborated testimony of the accomplice. The scene to which I have referred was throughout a spectacular performance more suitable to the stage than to the gravity of a court engaged in the judicial investigation of a charge upon the result of which a human life depended. If Jones had succeeded in the attempt, and the district attorney had brought his dead body into the court room and presented it to the jury, that, I think, would shock not only all our notions of law, but our sense of decency as well. And yet, what was actually done differed from that only in degree. The principle of law applicable to this question has been often stated in this court in a few weighty words, that, however familiar, I will venture to quote. " It is a well-established principle that illegal evidence which has a tendency to excite the passions, arouse the prejudices, awaken the sympathies, or warp or influence the judgment of jurors in any degree, cannot be considered as harmless." (People v. Corey, 148 N. Y. 489, 12 N. Y. Crim. 151, 163.) That is the rule even in civil cases (Hutchings v. Hutchings, 98 N. Y. 65; Anderson v. R., W. & O. R. R. Co., 54 id. 334); then how much more the necessity for enforcing it in such a case as the one at bar.

An ancient orator once stirred up the populace to a flood of rage and mutiny in an oration over the dead body of a great man, whom he described as his friend and the people's friend. He stimulated them to the most desperate deeds of violence, which ended in a revolution that in a political sense changed the face of the world, and resulted, according to the irony of fate, in the undoing and death of the orator who started the conflagration. His was a real case of suicide. If the orator of antiquity could thus have moved men's minds, who can doubt that the modern orator who tried this case made a great impression upon the minds of the jury, since human nature is the same in all ages, as he pointed to the gaping self-inflicted wounds of his witness and flourished the bloody knife with

which they were inflicted, as the surest pledge of his sincerity and the highest proof of his devotion to the cause of truth? When the jury retired to consider their verdict they must have reasoned among themselves and said one to the other something like this: " Surely a witness who has thus courted death and the grave must be telling the truth and ought to be believed."

It is said that the aphorism, suicide is confession, applies to this strange feature of the case, but this only reveals a very strange confusion of thought. Confession by whom and of what things? Certainly not by the defendant; but if at all, by the informer, it may be to procure sympathy as a victim or credit as a witness. It was certainly assumed that it would give him both in the mind of the jury; otherwise, the scene would not have been enacted.

2. The question whether Rice died a natural death or from the use of chloroform feloniously administered was one of the most important questions involved in the case. It has already been shown that the People attempted to meet that issue by the testimony of the two physicians who made the autopsy, and made so little of the appearance of the lungs that they cast them aside to be cremated with the body, while the other vital organs were delivered to a chemist for analysis. It is quite obvious, of course, that upon this issue the defendant had the right to call experts to prove the cause of death or the value in determining that question of such congestion of the lungs as the physicians were able to recall long after they had made the autopsy. This was such an important question to the defendant that he ought not to have been restricted or hampered in the production of his evidence. On this issue the defendant called Dr. Lee. He testified that he was a surgeon and physician of twenty years' practice; that he attended President Mc-Kinley in his last illness, and that he had administered chloroform thousands of times. The defendant's counsel then propounded to him a hypothetical question, which appears in the

record, and which is too long to be quoted here. It assumed, however, all the facts in the case, or at least the facts that the defendant had a right to assume. Among other things it assumed the case of a man eighty-four years of age, and that prior to his death and for several months he had been suffering with dropsy of the lower limbs and that the post-mortem examination revealed a congestion of the lungs—slight congestion that was not exactly co-extensive, and some other things that are not material here, and then concluded the question with the words, " What, Doctor, would you say was the cause of death ?" This question was excluded by the court upon the sole ground that, in framing it, the defendant's counsel had used the words " that the post-mortem examination revealed a congestion of the lungs—slight congestion that was not exactly co-extensive to use that word." It was contended that the coroner's physician who had testified to the appearances at the autopsy had not used any such expression ; but in .this the learned court was evidently mistaken, since the record shows just what Dr. Donlin, one of the coroner's physicians, testified to : " Q. Then as I understand it you mean to say that the congestion was co-extensive with the lung ? A. No, not co-extensive exactly." It is very obvious that the defendant was prevented by the ruling of the court from presenting to the jury the opinion of an eminent expert on a vital question, which was, the cause of death as evidenced by the congested condition of the lungs. The hypothetical question to the expert witness is proper, although it may include only a portion of the facts in evidence, and it may assume any state of facts which there is some evidence to sustain and the opinion of the expert may .be taken upon the facts so assumed. An error in the assumption does not make the interrogatory objectionable if it is within the possible or probable range of the evidence. A counsel may even assume the facts in accordance with his theory of them.

It is not essential that he state the facts as they exist or as they were described by the witnesses of the opposing party. (Cole v. Fall Brook Coal Co., 159 N. Y. 59 ; Stearns v. Field, 90 id. 640 ; Cowley v. People, 83 id. 464 ; Dilleber v. Home L. Ins. Co., 87 id. 79.) In framing the hypothetical question it is very clear that the defendant's counsel had a right to view the facts in the most favorable light for his client. If Dr. Donlin or any of the People's experts testified both ways or their statements were ambiguous the counsel had the right in framing the question to the most favorable view for his client. That this ruling was a plain error upon a vital issue in the case seems very clear to me. It is difficult to understand why any court in the trial of a capital case should exclude the testimony of an expert for the defense upon such a narrow criticism as was adopted in this case.

3. It cannot be too often repeated that aside from Jones the two most important witnesses for the People were the two coroner's physicians who made the autopsy. Neither in their official report nor in their certificate as to the cause of death, or in any of the numerous proceedings before police magistrates or otherwise, which involved an inquiry as to that fact, did they pretend that they had discovered any proof of poison by chloroform as the cause of death until several months after the autopsy, when Jones had completed his final story to the effect that he himself had killed the deceased with chloroform. The physicians then began to educate themselves by experiments and otherwise to sustain this theory as witnesses. When on the stand they not only supported that theory as experts, but claimed that they had discovered indications of chloroform poisoning at the autopsy in the congested condition of the lungs. It was, therefore, of the first importance to the defendant to impeach or contradict these two witnesses if he could by showing that at or just after the close of the autopsy they

had publicly stated the result of their examination and that it was inconsistent with or contradictory of their statements as witnesses on the stand.

This was just what the defendant's counsel attempted to do, but was prevented by a ruling of the court. After the close of the People's case the defendant's counsel called a witness who had been an attendant at the morgue and was present at the autopsy and heard what was said. We know from an affidavit of this witness, which is in the record and was used upon the motion for a new trial on the ground of newly-discovered evidence, just what the defendant's counsel sought to prove by him. It was this, that just after the autopsy Dr. Donlin, who participated in it, stated to several persons present in the room, some of whom were newspaper reporters, that Rice died of old age, and that the other physician who was present and heard the statement assented to it. This testimony, it is perceived, would go far to impeach or greatly discredit the two most important witnesses for the People in the case. There are authorities that hold in effect that inasmuch as the People had put into the case the written report of the autopsy, an official act, the statements at the time of the public officers who made it, were admissible as part of the *res gestae* and as original evidence. The statement sought to be proved by the witness did not contradict, but tended to sustain the certificate. But whatever the law may be on that point, the evidence offered was clearly admissible to impeach the People's witnesses, and a proper foundation for that purpose was laid in the cross-examination of Dr. Donlin. He testified that after the autopsy there might have been " a number of reporters. I do not recall it. I might have stated to them what the result of the autopsy was. I am in the habit of doing it." The defendant's counsel then propounded the following question to the witness: "And did you not say that he died from old age?" The witness, after stating that he did not

recall any such statement, that he could not have said it, finally answered, " I did not say that."

Now, we have the question put to the witness that pointed out to him the time and place and the occasion, but we are gravely told that it did not point out the *person* to whom the statement was made, although it appears that it was made in a room to a crowd, including reporters, and was not addressed to any one in particular. I had always supposed that a person who makes statements to an audience in a public speech and who afterwards, as a witness, denies that he made them, might be contradicted by any one who was present and heard the statements when they became material.

The defendant's witness, after testifying that he was present at the autopsy assisting the two physicians, detailed the many things that he did in the operation, and after stating that he heard Dr. Donlin make a statement as to the result of the autopsy, was asked the following question: " Did Dr. Donlin in that statement made there say that ' the old man's time had come and he died from old age and that is all you can make of it,' or words to that effect ?" The court sustained the People's objection to this question, on the ground that Dr. Donlin's attention was not called upon his cross-examination to the time or place of the alleged statement, or to the person to whom it was made. It was virtually held that unless the defendant's counsel could find the man upon whom Dr. Donlin's eye rested when he made the statement the question was improper. The defendant's counsel then modified the question and asked whether Dr. Donlin did, at the morgue, on the occasion of the autopsy, " in your presence and hearing say that ' the old man died of old age,' or words to that effect ? " The court promptly ruled out the question, and, defendant's counsel still persisting, requested the court to be allowed or permitted to recall Dr. Donlin to the end that he might propound to him a question that could comply with the views of the court with

reference to the form of a question sufficient as a basis for impeachment. The court refused to allow the witness to be recalled, although he was a salaried public officer who had received large fees for assisting in working up the case for the People.

Thus the defendant was deprived of the benefit of very important testimony by a series of ruling that have not even the doubtful merit of being styled technical, since, in my judgment, they are absolutely and radically wrong. They are all based upon the notion that it was necessary to name the man to whom the statement was made, when it was a public statement made to no one in particular and when the doctor swore that he did not make it at all. If these rulings were made in a police court on a trial for sheep stealing I am not sure that any appellate court would ever think of sustaining them, but they were made on a trial for murder, upon the result of which the defendant's right to live depends.

4. The genuineness of a great number of documents, too numerous to mention, became an important question at the trial. They were all claimed by the People to be forgeries and spurious. They tended to prove no doubt that if spurious the defendant and the accomplice had been engaged in the preparation of spurious documents with the view of getting possession of the estate of the deceased. In and of themselves it was claimed that they furnished a motive for the commission of the crime of murder; but forgery and murder are two different offenses and the accused might have been guilty of the former without being guilty of the latter. The most important of these alleged spurious documents was an instrument which purported to be the last will of the deceased. It had been denied probate in the civil courts and was the subject of a mass of testimony at the trial of this case. The proof as to handwriting proceeded not only from a number of experts, but from other witnesses

who claimed to be familiar with the handwriting of Rice and with his genuine signature.

Among the witnesses called and who gave testimony upon this issue was a young man named Cohn, who testified that he was about 30 years of age; that he had formerly been in the employ of the deceased for a few years as a clerk in Texas and was at the time of the trial in the employ of the Rice Institute, founded by the deceased, at a salary of $100 per month, and also in the employ of Captain Baker and the other executors of the Rice estate at an additional salary of $50 per month. All the persons mentioned were interested in the civil litigation to destroy the paper purporting to be the last will of the deceased, since that would result in an adjudication that the will bearing date sometime before was the genuine will of the deceased and which contained provisions in their favor. This witness testified that the various documents in question were forgeries. It appeared upon cross-examination that he was a brother-in-law of one of the trustees of the institute; that he had discussed the subject-matter of the two wills, one dated in 1896, and the other in 1900; that his present employers, that is, Captain Baker and his brother-in-law, were both engaged in contesting the disputed will, that before he came to New York to testify he had heard that Captain Baker had testified that in his opinion the signatures in question were not genuine. He also stated that he had examined these signatures a whole morning before he ventured an opinion to the district attorney; that he had heard Captain Baker testify before he had passed upon the signatures; that he was at the time stopping at the hotel where the people who were interested in the first will were also guests. He admitted that before he made his first examination of the disputed signatures he had read in the papers that some so-called handwriting experts had given it as their opinion that these signatures were not genuine signatures of the deceased. All this testimony was entirely legitimate.

In other words, the cross-examination of this witness disclosed the fact that all the time he had been surrounded by influences hostile to the defendant and that would be likely to warp his judgment and stimulate his private interests. These things greatly affected the value of his opinion as a witness. The defendant had the right to have these facts submitted to the jury. The learned district attorney, perceiving that the testimony of this witness had been greatly weakened by the cross-examination, took him in hand again and thoroughly toned him up in the following fashion: By showing that the witness, while being educated or persuaded by the parties with whom he had conferred, as to the opinion he had expressed, had heard from other parties who were entirely disinterested precisely the same thing. This was accomplished by two comprehensive questions that deserve to be stated in the words of the record. The first question was: " Did you also know that about 25 paying tellers in no way connected with the case had expressed their opinion that all these instruments were forgeries ?" He answered that he had. Not quite satisfied with this question, he propounded another to the witness, which is as follows: " Did you also know that every human being that you knew who knew Mr. Rice's handwriting had expressed the opinion that they were forgeries ?" The witness answered the question in the affirmative, and the court ruled, after argument, that the questions and answers were proper. It will be seen from what has thus been stated that the learned district attorney in a very adroit way got before the jury the opinion of about 25 paying tellers in no way connected with the case, and also the opinion of every human being that the witness knew who had any knowledge of the handwriting of the deceased. The learned court, after argument, pronounced this testimony competent for the jury.

That these questions and answers were grossly improper and plainly incompetent no one can doubt. The errors that I have

thus far called attention to are not only radical, material and prejudicial, but they have a much broader and deeper significance, since they cast a dark shadow over the whole trial, revealing the true spirit in which it was conducted. They serve to give color to the atmosphere that surrounded the defendant, and show with unerring certainty that a fair and impartial trial was scarcely possible, since these rulings could not have been made upon the trial if any effect had been given to the presumption of innocence, or that other and kindred rule that all questions where there is a reasonable doubt should be decided, not in favor of the People, but of the defendant.

5. Expert testimony fills a large place in the enormous record in this case. We have seen that that kind of testimony in these times costs money. In the marshalling and production of such testimony the People have an enormous advantage over the accused. The public prosecutor is not hampered or restricted by any considerations of economy. The State, with all its power, is behind him, and he is able to pay extravagant rewards to experts that may, by opinions or speculations, be able to sustain the charge, as witnesses on the stand. Not so with the accused. He is generally, if not always, without means to purchase this class of testimony. That must be true in this case, since the learned counsel who have argued the case at our bar find the primary motive for the defendant to engage in the series of crimes that have been imputed to him, the purpose or desire of escaping the pinches of poverty. In the face of such conditions, if the defendant was able to induce a few eminent men to become witnesses in his behalf and to spend a portion of their time in the court room, he ought not to have been hampered or restricted by any narrow rules in placing their opinions before the jury. They, at least, had no motive to pervert truth. Neither the public prosecutor by objections, nor the court by rulings, should have excluded anything that such

witnesses could testify to that had any bearing on the vital issue involved. Without referring to experts on the question of handwriting, the only question within the scope of medical experts was a very narrow, and it would seem to the common mind a very simple one.

The sole question upon which medical experts could throw any light was the question as to the significance of the congested state of the lungs of the deceased as proof that his death was produced by chloroform. If that was as plain a question as the learned counsel for the People assume it to be, we might ask why it was that it cost the two salaried officials who made the autopsy a year's time and one hundred and forty experiments, besides much study and reflection, in order to find out whether that condition of the lungs proved with reasonable certainty that Rice died from the application of chloroform. Of course, these experiments could have nothing to do with the question of fact whether the lungs were congested, and if so, to what extent. The People's two principal experts took the lungs from the body, and it was their duty to know whether they were or were not congested, and, if so, to what extent. They either knew what the condition of the lungs was, as matter of fact, or they did not. In any event, their subsequent study and experiments could throw no light on the question as to what was the real condition of the lungs as they appeared at the autopsy, and the only occasion for the use of medical experts in this case was to show that the condition in which the lungs were found at the autopsy was, under the circumstances of the case, reasonably certain proof that death resulted from chloroform; so that the condition of the lungs, as described by the officials who made the autopsy, was either reasonably certain proof that Rice died from the effects of chloroform or that it presented a doubtful and disputed question; and clearly the defendant had the right to offer any proof that contradicted the

opinion in that regard of the People's experts or that could throw any light upon the question.

For this purpose the defendant called Dr. Millican, who testified that he was the associate editor of the New York Medical Journal and a graduate from the Royal College of Surgeons of England and the Royal College of Physicians of Edinburgh; that he had been a surgeon in various hospitals in England and that he had made considerable study of death from chloroform; that in the course of his general studies he had studied three hundred and ten reports of autopsies found in various medical journals in Great Britain, France and Italy. He was then asked to state in how many of the autopsies that he had studied was there found a congestion of the lungs. This question was excluded. He was then asked in how many of the three hundred and ten reported cases that he had studied was there reported active congestion of the lungs. This question was also excluded. He then proceeded to state that he had searched through nineteen of the principal text books on therapeutics, but that testimony was also excluded. The defendant's counsel then propounded to him the following hypothetical question, which was excluded: " Now, Doctor, assuming that a cone or a towel is wrapped cone-shaped by wrapping the towel around the hand and then a sponge is placed in the small end of the cone and saturated with two ounces of chloroform, the cone thus saturated is placed over the face of the sleeping patient; state whether in your opinion the operation that I have described could be accomplished without waking the patient?" If it was proper to permit the People's experts to express an opinion as to the cause of death from the appearance of the lungs and from their experiments upon birds and animals, I am utterly unable to see why this witness could not be permitted to express a like opinion from the wide studies that he had made upon the same question. If he could say that in the reported autopsies where death resulted from chloroform, there was no congestion of the

lungs in half or in any of them, certainly that would go far to weaken the People's theory that the congested condition of the lungs of Rice disclosed by the autopsy was reasonably certain proof that he died from the effects of chloroform. Knowledge derived from a wide study of medical books or journals devoted to the science of medicine must throw light on such a narrow question as this case presented. If that is not so, it is difficult to perceive what value there is at all in such opinions. Medical knowledge is acquired in very much the same way as legal knowledge, that is, from the study of books. It often becomes necessary in litigations to prove what the law of some other State or country is with respect to some particular question, and that is generally proved as a question of fact by calling as witnesses lawyers who have practiced in the courts and have read upon the subject. It seems quite plain to me that if the lawyer had testified that he had read and studied say one hundred reported cases on the question, that fact would be admissible as a basis for his opinion as to what the law was on the disputed point. What distinction there is in this respect between a lawyer and a physician, each attempting to testify to knowledge derived from professional studies, I am not able to perceive.

The ruling excluding the question as to the effect of the cone upon the sleeping patient was equally, if not more plainly, erroneous. The People claimed that they had supported by evidence the proposition that the operation described would not only produce death in the twinkling of an eye, but that it actually did produce the death of Rice. That theory would be shaken very much if it could be shown that the operation, instead of producing instantaneous death, would awaken the sleeper, and that was precisely what the defendant attempted to prove by the question which was excluded. If Rice was alive at the time that Jones placed the cone upon his face, then death must have been produced literally in the twinkling of an eye.

The truth of that story all depends upon the testimony of the accomplice and certainly the evidence in that regard was not so conclusive, or even probable, as to warrant the exclusion of the testimony referred to.

The defendant's counsel having failed to get the proof that he offered before the jury called Dr. Girdner, who testified that he was a physician and surgeon of twenty-four years' experience and a graduate of the University of the City of New York. He stated that he had written on chloroform a great deal and had made a number of experiments with chloroform as to its effects upon the human system; that he had made experiments upon patients and attempted by the use of chloroform to transfer them from the natural sleep into a chloroform sleep; that he had performed thirty-two of these experiments upon sleeping patients. He was then asked to state whether in his opinion the odor of chloroform could be detected in a room three-quarters of an hour after it had been administered. This question was excluded. It is perfectly plain from the testimony of this witness that he was speaking of the facts in this case as disclosed by the testimony of Jones and that of the physicians at the autopsy. He was then asked to state about what are the chances of death from inhalation of chloroform and about how frequently death will follow the administration of that drug to a patient. These questions were excluded. He was then asked to state for how long a time, in his opinion, after an operation had been performed upon a patient in a room the odor of chloroform would remain therein. This question was also excluded. In view of the conceded fact in the case that no odor of chloroform was found in the room by the attending physician of the deceased, who arrived twenty minutes after the cone had been removed, and in view of the further fact that the claim of the People was that the condition of the lungs proved with reasonable certainty that the death of Rice was produced by the operation which Jones described and that was the real and sole cause

of death, it is very difficult to see what legal or reasonable ground there was for refusing to permit the witness to answer these questions. It seems to me· that the questions were in proper form and pertinent to the issue; but even if they were not and ought to have been framed in some different way the humane rules of the criminal law would dictate to the public prosecutor and the court the duty of suggesting in what respect the questions were defective. It seems to me, therefore, that the ruling of the court excluding the evidence referred to was clearly erroneous and prejudicial.

6. Another method of corroborating Jones and sustaining the charge in the indictment adopted by the People was to give proof of alleged confessions or admissions of the defendant claimed to have been made by him while in jail. Much of this testimony came from the accomplice, who had also been ar- . rested and confined with the defendant on the same charge. .Many damaging things were embraced in these admissions or confessions, which, if made at all, were clearly under the seal of professional confidence, which, as I think, was violated utterly in the manner which must now be related.

The People called a lawyer named Potts and examined him at great length touching these admissions. His testimony occupies about one hundred pages of the record. He testified that he was a lawyer and that he and the defendant occupied a common office or suite of rooms and the names of the two were on the door. He testified that at the very time when he was on the stand he regarded himself as having professional relations with the defendant which had never been severed; that these relations commenced immediately after the death of Rice, but he could not fix the precise date with certainty. There can, however, be no doubt that such relations were created and existed. The court took the witness in hand and examined him on that subject and fixed the date of the retainer as early as the 28th of September, that is, four days after the death of Rice, although

it is obvious that, considering the intimacy that existed between the witness and the accused, relations of confidence existed a long time before. He stated that he first knew the accused in Texas as early as 1870; that since the accused came to New York their relations were close, as the two lived at one time in the same house. There were at least two other young men who as stenographers or notaries occupied rooms in the suite in which the defendant's office was. Two of these young men were arrested after they had given testimony in favor of the defend-. ant upon some preliminary examination. It is quite evident that Potts had been terrorized by what had taken place and feared that he might share the same fate. It is only necessary to read the one hundred pages of testimony that this witness gave in order to perceive the various devices that were used to drag from the witness admissions and confessions of the most dangerous character which it was claimed the defendant had made to him. These instances are too numerous to mention. The court, after examining the witness, ruled that the testimony was not admissible, but afterwards he changed this ruling and decided that the statements were admissible unless it affirmatively appeared that the admissions were made after the retainer. The district attorney then proceeded to prove by the witness statements and admissions that he said the defendant made to him of the utmost importance. As to many of these statements the witness stated that he could not tell whether they were made to him before or after the retainer, but they were all admitted upon the principle stated which put the burden upon the defendant to prove that they had been made after the retainer and not before. After the jury had heard the confessions, such proof by the defendant when the time for his defense arrived, it may be weeks after the objectionable testimony had done its work with the jury, would obviously be utterly worthless. Moreover, the nature of the testimony given indicated very clearly that the admissions were made under the seal

of professional confidence. This testimony was all received under a theory of law manifestly unsound. The true rule is that when professional relations have been once shown, and there is doubt whether the admissions were made before or after the commencement of these relations, or when the witness cannot fix the date, as in this case, the testimony must be excluded. The principle adopted in this case would not afford the least protection to the client against the violation of professional confidence by his own counsel. All that would be necessary, upon the theory adopted in this case, would be for the counsel to forget or misrepresent the date of the retainer, and thus while pretending, as Potts did, to observe in a perfunctory way his professional duty, the spirit and substance of the rule could be violated with impunity. With respect to the testimony now under consideration, it is perfectly obvious that the witness was compelled or volunteered to state admissions to him after the date of the retainer, but the whole examination discloses, as I think, a total disregard of the rules of law that govern the relation of attorney and client. In a well-considered case, in which this question was discussed and decided, it was held that where the witness was unable to distinctly state whether the admissions were made to him as counsel or before that relation commenced, the evidence must be excluded. The court added that whatever may be the rule in civil actions in that regard, testimony of this character ought not to be admitted in criminal prosecutions. (People v. Atkinson, 40 Cal. 284.) The same principle was held in the case of Bacon v. Frisbie (80 N. Y. 394), where it is held that any statements or admissions which may be supposed to have been drawn out in consequence of the relations of the parties to each other are entitled to protection as privileged communications.

But there was another incident that occurred at the trial that was even worse than the one referred to. The defendant and the accomplice were both confined in the same room in the jail.

They employed the same counsel to act for both of them. This counsel and his assistant, who was also a lawyer, visited and had conferences with both clients at their room in the jail. At one of these conferences the counsel and both clients were present. No one else was. When the accomplice was on the stand he told the jury what took place at the conference, and what was said by each and all of them, but after argument, in which court and counsel joined, the court concluded that the testimony was not admissible and struck it out after the jury had heard it. But the learned district attorney was not to be foiled by any such ruling, since he at once was enabled to prove by Jones that some of the most damaging admissions were made to him by the accused when they were both in the corner of the room and when the counsel was some distance from them in another part of the room, and he said that they talked in such a low tone that they could not be heard by the lawyer. Of course there was no attempt to corroborate either as to the admissions or the particular spot in the room where they were made. This testimony gave a new aspect to the question in the judgment of the court and the district attorney, and the examination proceeded on the notion that all that was said by the defendant could be proved providing Jones could swear that the lawyer did not hear it. Jones then was permitted to testify to the most damaging kind of statements which he claimed the defendant had made to him while in the corner of the room occupied by the three persons engaged in the conference, and that after making these admissions the three came together again. It is important to observe that these statements, claimed to have been made in the corner, were not stricken out at all. That what occurred at this interview and all that occurred there was privileged and could not be disclosed by Jones against the protest of the defendant it seems to me no one can doubt. The privilege did not depend upon any such shallow pretense that it was not heard by the lawyer. The privilege rests upon the nature of the con-

ference, the occasion and the purpose and subject-matter of the
interview, and whether any of the parties failed to hear what
the others said was not a matter of any consequence.  Indeed,
according to Jones, the two clients while in the corner were con-
sulting as to the answers to be made to some questions which
their counsel had put to them, and after some conversation in
the presence of the lawyer, who had turned aside, they all re-
sumed the conference.  It seems to me to be absurd to contend
that where two clients have a common counsel or attorney and
are together in his office for the purpose of advice and consulta-
tion between them all, and something is said between the two
clients while the lawyer has stepped into the next room, that
one of the clients could disclose the statement thus made without
the consent of the other.  In such a case the privilege would not
apply in a subsequent litigation between the two clients, but it
does apply where the subsequent litigation is between one of
them and a stranger.  (Hurlburt v. Hurlburt, 128 N. Y. 424;
Root v. Wright, 84 id. 72.)

But even if the court had stricken out everything that had
taken place at this conference and everything to which Potts
testified, the error would not and could not have been cured
under the recent decisions of this court.  The jury heard the
testimony and under the circumstances of this case they can-
not be presumed to know what became of it, since nothing was
said about it in the charge.  The jury retired to consider their
verdict two months after the perfunctory ruling of the court
striking out some and leaving in the record the worst part of
the testimony.  The jury may not have understood at the end
of the argument and in the heat of the trial just what signifi-
cance the ruling of the judge had, and it cannot be presumed
that they either understood or remembered what became of this
evidence.

The case of Ives v. Ellis (169 N. Y. 85) is the latest au-
thority on this question.  In that case a letter was offered in

evidence which, it was said, contained hearsay statements made by a third party. It never seemed to me that it was of any importance on the trial one way or the other. It appeared that the trial judge charged the jury in regard to this letter in the following words: "I desire particularly to caution you to disregard entirely in your deliberations the contents of the letter written by Mr. Ellis to Mr. Ives in response to the latter's inquiry. That letter was admitted solely for the purpose of proving its receipt by Mr. Ives and not to bring before you any of the matters therein contained." Notwithstanding that caution, this court reversed the judgment on the sole ground that the error had not been cured. In the opinion of the court we find the following words: "But before an appellate court will hold that such an error has been cured, it must feel sure that the effort of the trial court to correct the error was necessarily effective with the minds of the jury. Now, that cannot be said of the caution of the court in this instance, for it must be borne in mind that this letter was introduced in the early part of the trial, which was not only a long one, but in its progress there was an adjournment for a period of ten days, during which the jurors presumably had their minds occupied with affairs of their own." Judge LANDON, who wrote a concurring opinion, was quite as clear and specific, and his words ought to be quoted: " The letter being hearsay and incompetent upon the real question, but from its very terms being one which the jury would regard as pertinent to it, they would naturally treat the judge's attempt to exclude its contents from their consideration as a perfunctory instruction, given in pursuance of some technical rule, unless the instructions to disregard it should be so clear and explicit as not only to amount to a command but to a fair counterpoise to their natural convictions. . . . Notwithstanding what the trial judge said, the jury would find it hard to go counter to their own convictions."

The contrast between the two cases cannot fail to strike the mind. In the civil case referred to the jury retired to consider their verdict with the strong and clear words of the judge commanding them to disregard the letter ringing in their ears, and yet the judgment in that case was reversed upon the sole ground that the error had not been cured. In the capital case at bar the jury retired to consider their verdict two months after the perfunctory ruling of the judge, which purported to strike out a portion of the objectionable testimony in the midst and in the confusion of a trial, and not a word of caution was given to them in the charge with respect to this most objectionable evidence, and yet it is now contended that the errors in admitting the evidence have been cured. Is there anything about this case that requires us to put such a strain upon law and argument? If so, what is it? It is, I think, quite unnecessary to extend the discussion upon such a plain question. It may be added, however, that the trial of this case commenced January 22 and ended on April 7, 1902.

7. The People produced and put in evidence what purported to be a typewritten letter signed by Rice and addressed to the defendant, to the effect that after his death his desire was that his body should be cremated. In this paper he referred favorably to Col. Ingersoll and Col. Waring, whose bodies had also been cremated. The public prosecutor claimed and gave proof tending to show that the signature of the deceased to this paper was a forgery. It was not claimed that the signature was in the handwriting of the defendant. The purpose of introducing this paper was to show that it was concocted by the defendant as an excuse or authority for the prompt cremation of the body of the deceased in order that the alleged poisoning might not be discovered. Whether the signature of the deceased to this paper was genuine or forged became an important question in the case. Anything that the deceased had said in conformity with the sentiments expressed in that letter was admissible as

bearing upon the probability of its genuineness, and the defense was not limited to the narrow question of the genuineness of the mere signature, but should have been permitted to show that the sentiments contained in the letter were those expressed by the deceased and those which he would have been likely to have written.

The defendant's counsel called a witness who testified that he was a lawyer in the employ of the Manhattan Railway Company for ten years; that he was acquainted with the deceased for over thirty years; that the deceased was an old friend of the witness' father; that they were together in Texas when they were boys, and that the deceased and the witness' father were associated in business; that he was intimately acquainted with the deceased and had visited his house on an average during the last few years once every two weeks; that he was not acquainted with any of the defendant's counsel who were named; that he had drawn a few years before a codicil to the will of the deceased; that he had a conversation with him in the summer of 1900, but could not fix the particular date. The witness was then asked the following question: " Mr. Adams, in that conversation that you say you had with Mr. Rice in the summer of 1900, did he tell you that he had made arrangements for cremating his body?" The court refused to permit the witness to answer the question. If the deceased actually entertained, up to the time of his death, the sentiments in regard to the disposition of his body after death that were expressed in the letter, it seems to me that the question was competent. We must assume that the answer of the witness would be most favorable to the defendant, and the question is whether, there being a dispute in regard to the genuineness of the signature, the defendant did not have the right to show that the paper expressed the sentiments of the deceased on the question of cremation entertained by him in his lifetime. This evidence, of course, would not be conclusive, and it may be that it was not evidence

of the highest character, but it had some bearing on the probabilities of the case.   It is reasonable to suppose that a person who all his lifetime expressed a desire to have his body cremated, would express that desire in some formal way before his death, to the end that his wishes might be carried out.   Let us suppose the case of the will of a deceased person, which is attacked after his death on the ground that he never signed it, but that his signature attached thereto is a forgery.   There is no question about the intention of the testator in regard to the disposition of his property as expressed in the will, but the sole question is whether his signature is genuine or forged. Now, it seems to me, that the contestants in such a case would be permitted to prove that the testator on various occasions down to the time of his death had declared that he intended not to make a will and would never make one.   It seems to me that such testimony would throw light on the disputed question whether the signature was genuine or spurious.   In Chase's Stephen's Digest of the Law of Evidence, (at page 99) it is stated that the declarations of the testator are admissible as evidence when his will has been lost, and when there is a question as to what were its contents, and when the question is whether an existing will is genuine or was improperly obtained, and when the question is whether any and which of more existing documents than one constituted his will, and in all these cases it is said that it is immaterial whether the declarations were made before or after the making or loss of the will.   These propositions, it seems to me, are well sustained by judicial authority.   (Matter of Hesdra, 119 N. Y. 615; Taylor Will Case, 10 Abb. Pr. [N. S.] 300.)

If this rule of evidence is applicable to a will, where the genuineness of the signature is in dispute, I am unable to perceive why it is not equally applicable to an informal paper which purports to give directions regarding, or makes disposition of one's remains after death.   So, it seems to me, that the defendant

had the right to have this testimony submitted to the jury for what it was worth, and even if the question was doubtful the ruling should have been in favor of the defendant and not the People.

8. The defendant called a young man as a witness in his behalf named Short, who testified that on the 30th day of June preceding the death of Rice he, with another young man named Meyers, was present with Rice in his apartments. The testimony of this witness disclosed the fact that he with Meyers had been frequently at the apartments of the deceased and there executed papers that he said Rice had signed in his presence on various occasions. He identified two papers in particular which purported to have been executed on the 30th day of June preceding the death of Rice. One of these papers was the disputed will and the witness testified that he and Meyers with the deceased were present in a room in the apartment and that Rice there in their presence signed these instruments and requested both of them to become subscribing witnesses, and they signed their names as such. There does not seem to have been any dispute about the fact that the signatures of these two young men to the disputed papers were their genuine handwriting, nor was there much dispute about the fact that both of them had been present on various occasions in the apartments of Rice and there participated in the execution of papers as witnesses or as acknowledging officers. The witness was subjected to a long cross-examination, in the course of which various rulings were made by the court, and I will refer to only one of them. In the course of this examination the district attorney said to the witness: " You have been under arrest in this case for perjury, haven't you?" This question being objected to the court ruled that the district attorney might show the interest of the witness in the case, since that had a bearing on his credibility. I am unable to find in the record any specific answer to the question, but it is quite evident that the fact of the arrest was

assumed from the form of the question and from what the court said in reply to the objection. How the arrest could show any interest of the witness in the case on trial it is difficult to perceive. It has been held by this court that such a question is incompetent and improper, and ground for reversal. (People v. Brown, 72 N. Y. 571; People v. Crapo, 76 id. 288.) The form of the question amounted virtually to a statement to the jury by the district attorney, with the approval of the court, that the witness had been arrested for perjury. On the redirect examination the witness stated to the defendant's counsel that upon giving testimony in the preliminary examination before Judge JEROME he was arrested before the hearing was completed. He was then asked how soon after he had been called as a witness for the People on that hearing was the arrest made. The answer to this question was excluded. He was then asked how soon after he had finished his testimony in that hearing that he was arrested. Now, since the court had permitted the district attorney, under objection, to show that the witness had been arrested it was competent for the defendant to show the time and circumstances of the arrest. It was competent to show, if it could be shown, that the arrest was made without cause and in bad faith for the very purpose of destroying him as a witness to the will and as a witness for the defendant generally, and that process had to begin at some point. It seems that he was not arrested until after he had given testimony which was supposed to be adverse to the parties that were interested in destroying the will and adverse to the People on the preliminary examination. When the attempt had been made to affect his credibility by showing merely an arrest, the time, place and circumstances of the arrest would tend to explain the purpose for which it was made. It appeared that the witness was a friend and associate of the witness Potts, referred to in a previous part of this opinion, and it is evident enough that Potts had taken warning from

the fate of Short and Meyers and made his peace with the prosecution. The refusal of the court to permit this witness to explain when, where and all the circumstances attending the arrest was error. While this error, if it stood alone, might be overlooked, it only shows the tendency of the court to confine the defendant's proof within the narrowest limits, while the district attorney was permitted to question the witness about a great variety of things that had no possible bearing on the case.

The material for further discussion of the rulings made at the trial has not been exhausted by any means. There are numerous other questions raised by exceptions to be found buried in this record of twelve thousand folios that are quite as serious and harmful as those that have been pointed out, but to pursue the discussion would be simply extending an opinion already too long. The questions that have been discussed may differ from each other in importance as one star differs from another, but the trail of error is over them all. If what has been said cannot affect the judgment in this case it is useless to go on piling Pelion upon Ossa. It is admitted on all sides that this record presents legal errors, and the only answer made is that they are not serious enough to affect the judgment and that they may be overlooked under the provisions of section 542 of the Code; but these errors cannot find shelter under this statute, since this court has spoken upon that question with no uncertain sound. Here are the words of the court in discussing the scope and application of that statute (People v. Corey, 148 N. Y. 494, 12 N. Y. Crim. Rep. 151, 167):

" This statute in no way impairs or affects the previously well-established principle that the rejection of competent and material evidence, or the reception of incompetent and improper evidence, which is harmful to a defendant and excepted to, presents an error requiring reversal. Such a ruling affects a substantial right of a defendant even though the appellate court

VOL. XIX.—15

would, with the rejected evidence before it, or with the improper evidence excluded, still come to the same conclusion reached by the jury. The defendant has the right to insist that material and legal evidence offered by him shall be received and submitted to the jury, and to have illegal and improper evidence, which may be harmful, excluded, and to have the opinion of the jury taken upon proper evidence admitted in the case and upon such evidence only. (People v. Wood, 126 N. Y. 249; People v. Greenwall, 108 id. 296; 7 N. Y. Crim. 302.) As was said by EARL, J., in the latter case: ' A person on trial for his life is entitled to all the advantages which the laws give him, and among them is the right to have his case submitted to an impartial jury upon competent evidence.' " This rule as to the application of section 542 was repeated and unanimously approved by this court in People v. Strait (154 N. Y. 165; 12 N. Y. Crim. 479), and still later in the case of People v. Montgomery (176 N. Y. 219; 17 N. Y. Crim. 503.)

I have not been moved by the assertion, which was given much emphasis upon the argument, that this defendant is guilty. All we know or can know in a legal or judicial sense is that the jury have found him guilty, and this court can add nothing to the legal force or effect of that verdict by expressing any opinion about it. The question is whether the verdict is affected by legal error, and if it is, it is our solemn duty to set it aside. The duty of this court in such a case is to " hew to the line, let the chips fall where they may." Lord MANSFIELD said on a memorable occasion that wherever he had the honor to sit as judge, neither royal favor nor popular applause would protect the guilty. Pursuing the same line of thought, I may be permitted to say that, as a member of this court, neither popular opinion as to this case, if such there be, nor any amount of specious or sophistical argument will induce me to assent to a conviction in any capital case, however guilty the accused may be thought to be, unless he has had a fair and impartial trial

according to the law of the land. Such a trial does not consist in the mere observance of form and ceremony, but in the recognition and practical application of the rules of law which this court has so often announced. We are deciding cases at almost every term and reversing convictions for errors of law that do not compare in importance with those that I have attempted to point out. Indeed, it can safely be asserted that in all the records of this court no case can be found where a conviction for a capital offense has been sustained in the face of such objections as this case presents. I am aware that that is a broad statement, but I have no fear that it can be questioned.

I can see no reason for making this case an exception. Murder is murder and a very wicked crime in every case and under all circumstances; but I can see no distinction between this case, where the defendant has been found guilty of advising another to administer chloroform to a rich old man living on a fashionable avenue in New York, and any other defendant who shoots or poisons his wife, or with his own hand slays the poorest beggar in the land. A legal error in this case must be treated in the same way as a legal error in any other criminal case. The law is no respecter of persons whether living or dead. The position of the victim of crime, whether rich or poor, has not the weight of a feather in the administration of the criminal law.

This court has always in such cases as this dealt with questions of law and when errors have been disclosed by the record have reversed judgments of conviction without much regard to the question of guilt or innocence. It has always recognized the rule that there cannot be a fair and impartial trial, within the true meaning of those terms, unless the accused has had the benefit and advantage of every principle of law that could aid him in sustaining his defense, and it has held, whenever the claim was made that errors were not harmful, that the burden of showing that they were not, by any possibility, does not rest

upon the accused, but the People must show that such evidence was harmless and could not have prejudiced him. (People v. Smith, 172 N. Y. 210; 17 N. Y. Crim. 39.) In People v. Taylor (177 N. Y. 237; 18 N. Y. Crim. 92), a married woman was convicted of the murder of her husband by shooting him with a pistol. She chopped off his head and some of his limbs and burnt them in a stove. She also burnt the rest of the body. The burnt flesh and bones were found in a heap of manure at the barn and identified. The case presented a frightful example of human depravity, and yet this court reversed the conviction, Judge GRAY writing the opinion, on the ground that the evidence of previous threats and assaults made by the deceased had been excluded. It was held that such evidence was admissible upon the question whether the homicide was justifiable as having been committed in self-defense. In People v. Mull (167 N. Y. 247; 15 N. Y. Crim. 490), we reversed a conviction in a capital case, Judge LANDON writing the opinion, on the ground that the district attorney in summing up the case appealed to the jury on the ground that an acquittal in such a plain case would expose them to the hostile criticism of the community. In People v. Bonier (179 N. Y. 315; 18 N. Y. Crim. 516), we reversed a conviction on the ground that it was error in law to refuse to charge that the presumption which arises as to defendant's good character both from the failure to attack it as well as the testimony given, may of itself be sufficient to raise a reasonable doubt as to the defendant's guilt. In People v. Smith (172 N. Y. 210; 17 N. Y. Crim. 39), this court reversed the judgment of conviction in a case where the defendant was convicted of murdering his wife, and the reversal was upon the grounds stated in the opinion.

These precedents in this court might be multiplied indefinitely, and be it remembered that in none of them was there a shadow of doubt as to the *corpus delicti,* or as to the author of the crime, and the errors assigned for the reversal were, in my

opinion, insignificant in comparison with the catalogue of errors that the record in the case at bar discloses. It is not necessary to extend the discussion. I will only remark that, guided by the light of the decisions of this court, I have fairly met and discharged, in my view, the burden which I assumed at the outset of the discussion.

The judgment should be reversed and a new trial granted.

CULLEN, Ch. J. (dissenting): I vote for reversal of this judgment, but as I disagree with several propositions stated by my brother O'BRIEN, I deem it necessary to state the grounds of my action.

I think the evidence was sufficient to justify and require the submission of the issue of the defendant's guilt of the crime charged to the jury, and had the trial been free from substantial error I would not be disposed to interfere with the verdict of the jury. Nor do I regard the grounds on which application was made for a new trial as possessing substantial merit. The fact that Jones, the defendant's accomplice, was to have practical immunity from punishment was as apparent on the trial as it was on the application made for a new trial. The fact that the coroners' physicians received compensation for their services in making experiments to qualify them as experts on the trial constitutes no ground for discrediting their testimony. While every person must sacrifice his time for the administration of justice and testify to facts within his knowledge in criminal cases without any compensation, I do not understand that a witness can be compelled to exercise his judgment as an expert and testify to the results of his examination and reflection without compensation for his labor. If there is any suspicion that the testimony of an expert witness is affected by the magnitude of the compensation he has received, or is to receive, he may be examined as to the matter by the opposing counsel. But the presumption being that the witness is to receive compensation, inquiry as to it, if deemed important,

should be made at the trial. There is nothing in this case to show that the compensation subsequently paid was extravagant or exorbitant.

The question of whether an error committed on the trial of a cause requires a reversal of the judgment is necessarily a question of degree. By the express terms of the Code of Criminal Procedure (§ 542) we are required to give judgment without regard to technical errors or exceptions which do not affect the substantial rights of the parties. Personally, within a short time past, I have written for the affirmance of a judgment, in a capital case,* where there was a plain legal error in the admission of testimony, because it seemed clear that the improper testimony could have had no effect on the verdict. There are a number of errors of that character in the present case which might well be disregarded, such as the allowance of the question by the district attorney put to a witness for the prosecution asking him whether he did not know that every person to whom the will and disputed signatures of Rice had been presented had pronounced them false. The People had proved the signatures to be forgeries by so many witnesses and such abundant testimony it is not possible to see that the answer to this question could have influenced the verdict. Such also is the case with the testimony which Jones was allowed to give as to confessions made to him by Patrick when he and Patrick were in consultation with their counsel. This error, if error it was, which may be doubted, could have had no influence on the verdict. Jones had already testified to the complicity of Patrick in the crime and that was the question to be determined by the jury. Jones' testimony that Patrick subsequently confessed the crime in his presence did not tend to make his story of the transaction any more credible, as both the complicity and the confession rested on the statement of the same witness, that

* Reference is here made to the Silverman Case, 181 N. Y. 235; *infra*, p. 360.

witness an accomplice. But there is a limit to the extent to which we may disregard errors even in a case where we think that the verdict is warranted by the facts. The guilt of a prisoner must be found by the jury not by this court, and be found on a trial conducted in accordance with the rules of law. It is an error which is not only technical but which does not affect the substantial right of the defendant that we are authorized to disregard. In my opinion there were several vital errors committed in the admission and exclusion of testimony.

1. Suicide or an attempt at suicide made under charges of crime, like flight, is a confession, and it is only as a confession that the fact of such attempt at suicide is admissible in evidence. It is plain that the confession of Jones was not competent evidence against Patrick and, therefore, Jones' attempt at suicide was equally incompetent.

2. The theory of the prosecution was that the death of the deceased was caused not by the anæsthetic effects of chloroform, but by the irritant effects of the vapor of chloroform on the lungs or by asphyxiation. As said by one of the experts for the People, chloroform caused the death of the deceased just the same as the vapor of ammonia or any other irritant gas would have done. This theory was based on the proposition that nothing else than an irritant vapor or gas could have produced a condition of congestion co-extensive with the whole lungs. Dr. Loomis, probably the principal expert for the prosecution, testified: " The important point in an autopsy of that kind would be an explanation of the intense congestion all over the lungs. That would call anybody's attention to find out why those lungs were intensely congested all over; and finding no other cause of death, you would reason that some irritant, either in gas or some vapor or something, had come down through the mouth, through the windpipe, through these bronchial tubes and had gone over the lungs. I know of nothing outside or beyond an

irritant vapor or gas that will produce congestion, co-extensive with the lungs." Jones testified that he did not know whether the deceased was living or dead at the time of the administration of the chloroform. But if it was established that there was this general congestion of the lungs and that such congestion could be produced by nothing but an irritant vapor or gas, it is plain that the deceased must have been alive at the time of the administration of the chloroform, because if dead he could not have inhaled its vapors. Therefore, the case turns in the first instance on the question of fact whether there was this congestion co-extensive with the lungs, and that fact depends on the statement of three witnesses, two coroners' physicians and the chemist. The most important of these witnesses in his testimony was Dr. Donlin, one of the coroners' physicians. The defendant's counsel sought to contradict the witness' testimony in this respect by proof that at the close of the autopsy he had declared in the presence of reporters and others that the deceased died from old age. This testimony was excluded on the ground that the attention of the witness Donlin had not been called specifically to the declaration. Counsel then asked to recall Dr. Donlin for the purpose of asking him whether he made such a declaration. This request was refused. I think the attention of the witness had been sufficiently called to the declaration, but if it had not been, I think the refusal of the trial court to allow the witness to be recalled so that the question of the declaration might be put to him was a clear abuse of discretion. As already said, the extent of the congestion was the vital point in the case. Dr. Loomis testified substantially that such a condition of congestion was so abnormal that it "would call anybody's attention to find out why those lungs were intensely congested all over." Now, if at the conclusion of the autopsy the doctor, so far from alluding to this remarkable state of congestion, stated that the deceased died of old age, it might well

be argued that he had not observed the state of congestion which he testified to on the trial and which, according to Dr. Loomis, should have been the first thing to have attracted the attention of any one performing the autopsy. This error seems to me most substantial in its character and one that cannot be disregarded.

3. I agree with Judge O'BRIEN that it was error to exclude the hypothetical question put by the defendant's counsel to his expert, Dr. Lee, on the ground that it failed to state that the congestion was co-extensive with the lungs. The defendant's counsel was not obliged to assume that fact even if Dr. Donlin had testified to it unqualifiedly, which I think he did not. He had the right to assume the aspect of the case most favorable to his side in his hypothetical question, and he had the right to ask the jury to reject the testimony of the doctor that the congestion was co-extensive with the lungs.

4. I agree with Judge O'BRIEN that the exclusion of the question to Dr. Girdner, an expert of great experience in the administration of chloroform, as to how long after its administration the odor of chloroform would be discernible, was error, and also that the exclusion of the questions to Dr. Millican, of his judgment based on his researches as to the presence of congestion in the cases of death by chloroform, was error. The effect of these erroneous rulings as to expert testimony must not be underestimated, for the vital fact to be proved was the death of Rice by chloroform, and though Jones testified to its administration, still Jones being an accomplice it was necessary under the statute that Jones be corroborated. That corroboration in this case consisted of the proof of two facts, the general congestion of the lungs and that such condition could be produced only by the inhalation of an irritant vapor. The second fact, which was as essentially an element of the proof as the first, necessarily rested wholly

on expert evidence. Therefore, errors in rulings on such evidence were substantial and prejudicial.

There were other errors in the case. It is unnecessary, however, to pursue the discussion, as I base my vote on the grounds stated.

BARTLETT, HAIGHT and WERNER, JJ., concur with GRAY, J.; O'BRIEN, J., reads dissenting opinion, and VANN, J., concurs; CULLEN, Ch. J., concurs in memorandum.

Judgment of conviction affirmed.

## IV. MOTION FOR REARGUMENT.

### Court of Appeals, 183 N. Y. 52.

(Submitted Oct. 2, 1905; decided Oct. 27, 1905.)

1. APPEAL—REARGUMENT OF CAPITAL CASE.

While in capital cases appellants will not be held to the rule that points alleged to have been overlooked by the court and made the basis of a motion for reargument must have been raised by counsel on the argument, yet, where no important objection has been overlooked, the motion must be denied; the fact, however, that exceptions raised upon the trial are not specifically alluded to or separately discussed in the prevailing opinion does not indicate that they were not considered before the decision of the appeal.

2. RELATIONSHIP BETWEEN JUDGE AND PUBLIC OFFICER WHO OPPOSED MOTION FOR NEW TRIAL.

The relationship of father and son, existing between a judge and one whose sole connection with a capital case is that, as an assistant district attorney, he opposed defendant's motion for a new trial upon the ground of newly discovered evidence, does not legally disqualify the judge from taking part in the hearing and decision of an appeal; nor does such relationship render it improper for him to sit in the case or justify him in refusing to do so; a motion for a reargument, therefore, based upon such alleged impropriety must be denied, especially as an objection of this character must be taken at the commencement of the argument, and not delayed until an unfavorable decision of the appeal.

David B. Hill and Edgar J. Kohler, for motion.

William Travers Jerome, District Attorney (Howard S. Gans, of counsel), opposed.

CULLEN, Ch. J.: Though I am one of the minority who dissented from the affirmance of the judgment of conviction in this case, I am entirely clear that the present motion for reargument should be denied. The grounds for such an application are stated by Judge PECKHAM in Fosdick v. Town of Hempstead (126 N. Y. 651): "A motion for reargument must be founded on papers showing that some question decisive of the case and duly submitted by counsel has been overlooked by the court, or that the decision is in conflict with the statute or a controlling decision." The learned judge further observed: "While it is very possible we err in many cases, yet the rule adopted is a proper one considering that there must be at some point an end of litigation."

While in a capital case we would not hold an appellant to the rule that the point overlooked must have been raised by counsel on the argument, it is just as true of such a case as of a civil case " that there must at some point be an end of litigation." That point was reached in this case when after a hearing accorded counsel far more extended in time than any that has been had before this court for years, after a consideration of the case for some months, and after frequent discussions at the consultation table, the court announced its decision. The matter should not now be reopened unless some important objection has been overlooked by us.

We have examined with care the elaborate brief filed by the appellant's counsel and find no objection discussed therein that was not considered by the court before it decided the appeal. In the opinions that were then written all of the questions raised that were deemed important were considered and discussed, and the opinions clearly expressed the views of the several members of the court thereon. It is true that in the prevailing opinion some of the exceptions raised upon the trial of the case were not specifically alluded to or separately discussed, but they all appear in the dissenting opinions, and were, there-

fore, necessarily passed upon by the court before it announced its determination. There is, therefore, no valid reason for granting this motion.

It is urged, however, as a ground for the application that Judge GRAY, who wrote the prevailing opinion, is the father of a subordinate counsel in the office of the district attorney of New York, Mr. Henry G. Gray, who appeared with Mr. Garvin, another deputy assistant, in opposition to the motion made by the defendant for a new trial on newly-discovered evidence. It is conceded that this relationship constituted no legal disqualification of the judge, but it is contended that the fact rendered it improper for Judge GRAY to sit in the case. It would be a sufficient answer to this claim that of an objection of that character, impropriety as distinguished from legal disqualification, the judge himself is the sole arbiter. (Matter of Dodge & Stevenson Mfg. Co., 77 N. Y. 101.) But the objection is now presented not to Judge GRAY alone but to the whole court, and it is only just to our associate that we should express our views on the subject. Many and great judges have allowed their relatives to practice before them; others have declined to hear cases in which near relatives appeared as counsel, but we have never heard of a judge refusing to sit in any case because at some earlier period his relative had taken part in the legal proceedings in the cause. This appeal was argued in this court by Judge Landon and Mr. Howard S. Gans for the prosecution. Mr. Gray in no way appeared in the preparation or in the argument of the appeal, and his sole connection with the case was that already stated. We think it would not occur to the most sensitive judicial officer that such a previous appearance in a case by his son, not as counsel for a private litigant, but as a public officer in the performance of official duties, would either bias his action or affect public confidence in the impartiality of that action. While if Judge GRAY had retired from the hearing of the appeal his associates would have

respected his motives, at the same time they would have felt that delicacy had been indulged in to an excessive degree at their expense and that a burden which in the ordinary practice of the court would, in the first instance, have fallen upon him, had been rather unwarrantably imposed upon one of them. It may be further said that if any objection was entertained to Judge GRAY's participation in the hearing of this appeal it should have been made at the commencement of the argument, when if he had sought counsel of his associates we should have advised Judge GRAY that it was his duty to sit. Counsel should not have awaited Judge GRAY's action, and finding that action unfavorable, now take the objection.

The motion for reargument should be denied.

GRAY, BARTLETT, HAIGHT, VANN and WERNER, JJ., concur; O'BRIEN, J., absent.

Motion denied.

## V. MOTION TO AMEND THE REMITTITUR.

### *Court of Appeals, 183 N. Y. 537.*

(Argued Nov. 20, 1905; decided Nov. 28, 1905.)

Motion to amend remittitur, by inserting therein a recital that upon appeal to the Court of Appeals defendant challenged his conviction for murder as being in violation of certain provisions of the Federal Constitution and that by its decision said court overruled such contention, denied. (See 182 N. Y. 131.)

Concur: CULLEN, Ch. J., GRAY, BARTLETT, HAIGHT, VANN and WERNER, JJ.

Dissenting: O'BRIEN, J.

## VI. APPLICATION TO RE-SENTENCE.

### *Supreme Court, New York County.*

(Unreported.)

On Nov. 13, 1905, a notice of motion was given for an order commanding the agent and warden of Sing Sing prison to bring

the defendant before the Supreme Court, Criminal Term, on Nov. 24, 1905, to inquire into the circumstances and determine if any legal reason existed against the execution and sentence, and upon such determination to issue a warrant to do execution of said sentence during the week to be appointed, etc., pursuant to sections 503, 504 of the Code of Criminal Procedure. This proceeding was taken in accordance with the doctrine of Matter of Buchanan, 146 N. Y. 264.

The foregoing application to re-sentence, etc., was brought on upon Nov. 29, 1905, at a Criminal Term of the Supreme Court, in New York county before DAVY, J., a motion was granted to set the date for fixing the sentence before STOVER, J., at Special Term Part II of the Supreme Court, New York county, upon Dec. 6, 1905, at 2 P. M. Upon Dec. 6, 1905, the proceeding again came on before STOVER, J., at Special Term, Part II, aforesaid. The proceeding was thereupon referred by STOVER, J., to the justice then sitting at the Criminal Term of the Supreme Court, New York county.

The proceeding was then brought on before ROGERS, J., presiding at said Criminal Term, and, after a hearing, the defendant was duly sentenced to be executed during the week commencing Jan. 22, 1906.

Various reprieves were subsequently granted to enable the defendant to make his second motion for a new trial which is referred to below.

VII. SECOND MOTION FOR NEW TRIAL.

Court of General Sessions in the City and County of New York, June, 1906.

(Unreported.)

1. APPLICATION FOR NEW TRIAL.

    Since each case in the books depends upon features peculiar to itself, no general deductions can be drawn except a few well-established principles which must guide the judge in the exercise of a legal discretion in order that justice may be served and promoted.

2. ADMISSION OF ACCOMPLICE; CREDIBILITY OF WITNESSES.

It was shown by affidavits that since the trial, the accomplice, Jones, had stated that Patrick had nothing to do with the murder of Rice, and that he had perjured himself in laying the blame on Patrick in order that he, himself, might escape.

*Held:* That, assuming that such admissions had been made, the evidence was (1) hearsay and (2) cumulative.

*Held:* Also, that, on this branch of the case, the witnesses were unworthy of belief and that to grant a new trial upon such testimony would be an abuse of judicial discretion and a perversion rather than a promotion of justice.

3. EXPERIMENTS AS EVIDENCE.

It appears that 14 experiments were made on human bodies by the injection of embalming fluid into the right brachial artery to test whether the fluid could reach the lungs, and, if it could, whether it would destroy them for diagnostic purposes. These experiments were criticised as carelessly conducted.

*Held:* That " It would seem that where a new trial is sought on the ground of newly discovered evidence obtained by experiments that the method of investigation, the tests applied and therewith the character and sufficiency of the results arrived at, should be scientifically flawless and so invariable and inevitable as to demonstrate a law rather than furnish occasion for speculation."

4. OPINION EVIDENCE—CONFLICT IN.

The opinion pointed out the conflict between the evidence of the experts on both sides.

*Held:* That where doctors disagree on newly discovered opinion evidence, how can a judge declare that such evidence, burdened as it is with disputations and uncertainties, technicalities and obscurities, would, if presented to a jury, probably cause a different verdict.

This second motion for a new trial upon the ground of newly-discovered evidence was brought on by a notice of motion served February 2, 1906. Various hearings were had. The motion

[NOTE.—This motion was made after the affirmance of the final judgment. Hence no appeal could be taken from the order denying the motion. (People v. Mayhew, 151 N. Y. 607, 12 N. Y. Crim. 112.) It appears that during the legislative session of 1906, a bill was introduced, in the interest of Patrick, for the purpose of amending § 517, Code Crim. Proc., so as to enable an appeal to be taken from this order, in case the application was denied. The bill passed the Legislature, but was vetoed by Governor Higgins.]

was finally denied upon June 11, 1906, and the order was entered upon June 11, 1906.

Black, Olcott, Gruber & Bonynge (W. M. K. Olcott and Edgar J. Kohler, of counsel), for the motion.

William Travers Jerome, District Attorney (Francis P. Garvan, Assistant District Attorney, of counsel), opposed.

GOFF, R.: When on the 10th of June, 1901, the defendant interposed a plea of not guilty to the indictment charging him with the murder of William M. Rice, he thereby demanded his constitutional right of a trial before a judge and jury of all questions of law and fact involved in the accusation. This trial he had before a jury of his own choosing, and during the ten court weeks of its progress he availed himself of his further constitutional right by remaining silent and compelling the prosecution to affirmatively prove his guilt beyond all reasonable doubt. When this was done and his guilt declared by the verdict of the jury the law in its tender regard for a man convicted of murder stayed the execution of the sentence until his trial should be reviewed on the law and the facts before the Court of Appeals. After an exhaustive review, the majority of that court, speaking by GRAY, J., said that:

" A careful reading of this record and a grave consideration of the matters of proof have convinced me that the jury reached a just conclusion and that there is no warrant for, nor do the interests of justice demand, our interference with the judg-. ment. I see no occasion for the exercise in this case of the broad power conferred by the State upon this court in capital cases to reverse a conviction and to grant a new trial on the indictment."

It is now over four years since judgment was pronounced upon the defendant, and during that period he has, through the most skillful and resourceful efforts of successive counsel,

eminent in their profession, suspended its execution, and now, for the second time since that judgment, he seeks a re-trial and re-examination of all the issues that were disposed of by the verdict of the jury. For a new trial cannot be confined to the specific question or cause advanced in the application, but it is as if no trial had ever been had and devolves upon the prosecution the burden of again proving, if it can, every fact, detail and circumstance necessary to a conviction. This, however, must not militate in the slightest degree against granting to the defendant the relief he asks, if on examination of his proposed proof there arises a reasonable presumption that on a new trial the verdict of the jury would be different.

This examination has been had to the fullest extent. During the examination of witnesses attention has been given to their personalities and characteristics. Careful consideration has been given to the moving affidavits and the voluminous record of testimony, and while from the nature and circumstance of the case a prompt decision should be given, it is not necessary or practicable to write a lengthy review or opinion or to enter upon a discussion of authorities, since no case can be found of like character that will serve as a precedent, and since each case in the books depends upon features peculiar to itself, no general deductions can be drawn therefrom except a few well established principles which must guide the judge in the exercise of a legal discretion in order that justice may be served and promoted (Smith v. Matthews, 21 Misc. 150; Wilcox Co. v. Barclay, 48 Hun, 54; Sistare v. Olcott, 22 N. Y. St. Rep. 564; Barrett v. Third Ave. R. R., 45 N. Y. 628). And that this may be done, neither the hearing of the testimony, nor its consideration or conclusions thereon, have been confined by any so-called technical rules, but the broadest and widest latitude has been given in order that everything of a material character should be properly presented in defendant's behalf.

There are three grounds assigned for the motion: (1) That it is made to appear by the moving affidavits "taken in conjunction with all prior papers and proceedings had herein that upon another trial the defendant can produce evidence such as if before received would probably have changed the verdict, which evidence has been discovered since the trial, is not cumulative and the failure to produce which on the trial was not owing to want of diligence"; (2) "on the ground that the verdict rendered was contrary to law," and (3) "on the ground that upon the whole case a new trial will be in furtherance of justice."

There were twenty-five affidavits filed in support of the motion, fourteen of which relate to admissions by Jones and eleven to what, for convenience of description, may be termed the medical side of the case.

Thirty-three witnesses were examined, including those for and against the motion.

The main points of contention are (1) that since the trial, Jones stated to a number of persons in Texas that Patrick had nothing to do with the murder of Rice; that he had perjured himself in laying the blame on Patrick in order that he, himself, might escape, and (2) that the injection of embalming fluid through the brachial artery reached the lungs, and its effect was such as to make it impossible to determine, upon an autopsy on the body of Rice, whether or not death resulted from the inhalation of chloroform.

As to the alleged admissions of Jones these questions may be asked:

Assuming all that is claimed on the motion to be true, is it evidence of any independent fact? Is it newly discovered? Is it cumulative? Would its introduction on a new trial probably produce a different verdict?

It is not evidence of an independent fact. As it stands now it is hearsay and incompetent, and could not be introduced as

evidence in chief.* The only way in which it could become competent would be by asking Jones, on cross-examination, if he made such statements. If he denied that he had, then the affiants could be called in contradiction to show that he had. This would be permissible in order to show that Jones made contradictory statements. In reality such testimony is admitted for the purpose of impeaching the credibility of a witness, on the theory that a witness who makes contradictory statements is not entitled to a high degree of belief.

If Jones should admit that he made such statements, then the affiants could not be called, for there would be nothing to contradict. Jones' admission or denial of having made such statements would not present to a new jury any other or different question than that which was passed upon by the jury that heard him. There would be nothing new in the question of Jones' stability of character; there would be no new discovery of contradictory statements. Those questions were thoroughly and exhaustively discussed before the jury. Jones himself admitted on the witness stand that he had made at least four contradictory statements, some under oath, others meant to deceive his then counsel, and all more or less false.

When confronted with these varying statements, and with the equivocal position in which they placed him, as to whether any credence should be given to what he said at the trial, he claimed that no matter how many different statements he had made, he was then giving the true one, and said, " If you do not believe it, ask Mr. House, who was my counsel and who was Patrick's counsel. I waive all questions of privilege. I told this story to Mr. House, as I state here, before I ever saw

---

* In the Greenfield murder case a letter written by a third person, K., to the effect that he, K., had committed the murder, as well as a like anonymous letter, were offered in evidence by the defendant, but were excluded as hearsay. So, likewise, oral declarations of K. and others to the same effect were offered and excluded. *Held:* No error, the evidence being merely hearsay. (Greenfield v. People, 85 N. Y. 75.)

Mr. Osborne (assistant district attorney). Mr. Patrick was present, and I had previously had a conversation with him, in which I insisted that I would tell Mr. House." Under a claim of privilege as counsel to Mr. Patrick, Mr. House was not permitted to testify in relation to this conversation.

In reference to the consideration which should be given to Jones' testimony, the jury were charged: " The direct evidence of Jones comes from a self-confessed murderer . . . But such testimony should be received with great caution and be very carefully considered, and the law, ever watchful of the interests of the accused, provides that he cannot be convicted unless such testimony be corroborated." And again: " For nearly five court days Jones was on the witness stand. He underwent a close and exhaustive examination by the district attorney, and a most rigid cross-examination by the counsel for the defendant. His self-confessed part in a murder was sufficient to justify on your part an attitude of close observance of the man and of scrutiny of everything he said. In determining the truth or the falsity of his testimony, you should consider . . . his admission that at other times he made statements or confessions which were not true and which were in conflict with his testimony here." And again: " You have a right on the question of Jones' credibility to consider the fact that he has made various statements and confessions differing with each other and differing from his own testimony on the stand." The court charged the jury, in compliance with defendant's counsel's request (number 13) : " It appears in this case that the witness Jones has made absolutely contradictory statements relating to matters so serious as to tend to charge upon himself and others a capital offense. In weighing his testimony, therefore, you must consider that he appears before you as a witness who has, whenever it may have suited his purpose, stated what was false, and you are justified in making the inference that whenever he views it for his interest so to do, he would continue to make

false statements." So that the fact and effect of Jones' protean facility as a witness were iterated and reiterated, and no new jury could, by any new discovery of moral turpitude, have a more comprehensive knowledge or measure of the quality or value of Jones' testimony than the jury which delivered the verdict. In considering this branch of the case the Court of Appeals epitomized it in this sentence: " The evidence, independently of the testimony of the accomplice, is fraught with a crushing implication of the defendant in the deliberate purpose to kill Rice in order to possess his estate."

Strictly speaking, this new evidence is cumulative because it is of the same kind, to the same point, and when admissions of a witness are given in evidence on the trial, other admissions of a similar character and to the same point are cumulative (Hines v. Driver, 100 Ind. 315).

Except in point of time there is no substantial difference between an admission of falsity before trial and an admission of falsity after trial, and even if a verdict be obtained by perjury a court will not set it aside unless the witness has been convicted of perjury (Dycke v. Patton, 3 Jones' Eq. 332; Holtz v. Schmidt, 12 Jones & Spencer, 327).

But even if the serious defects which have been pointed out did not exist there would remain to be considered the quality of the testimony and the character of the witnesses on this branch of the motion.

It would be taxing human credulity to a point beyond forbearance to even ask twelve men in a jury box to give credence to the witnesses who have testified to the alleged admissions of Jones.

Apart from the inherent improbabilities of their stories, the trail of a common design and purpose was unmistakable. From the first witness, who confessedly perjured himself, to the last, there was little difference in either degree or kind. With some few exceptions, they were shown to be persons of bad repute and

unworthy of belief, and if Jones, with all his moral obliquity, were to deny their statements and a jury were called upon to decide where in the conflict the truth lay, they would be justified in law and morals in returning a *non liquet*.

To set aside the verdict of a jury and the solemn judgment of a court on such testimony would, in my opinion, be an abuse of judicial discretion and a perversion * rather than a promotion of justice.

There is no claim made that on the second or medical branch of the motion there has been a new discovery of any fact in relation to the death of Rice, of the autopsy upon the body or the chemical analysis which disclosed the cause of death. All that is claimed is that from certain experiments, subsequently made, doctors have been enabled to form opinions which would not only conflict with opinions given by medical men on the trial, but would also conflict with their testimony of the things and conditions which they observed and found upon the body of Rice. Thus there is urged as a basis for a new trial opinion evidence to be arrayed against opinion evidence, and also against evidence of physical facts and chemical conditions. On the trial the doctors swore that the lungs were congested, that such congestion was caused by the inhalation of an irritant gas, and that chloroform is an irritant gas. Jones testified on the trial that he administered chloroform to Rice as directed by Patrick, and that also under the same direction he gave to Rice during his sickness mercury and iron pills. Doctor Witthaus testified that he found in the intestines of Rice a grain and a quarter of mercury, and that in his opinion, to satisfactorily account for such a residium, a much larger quantity of mercury must have been taken by Rice during his life, and absorbed by the process of absorption of the body. On this point the jury were charged

---

* A new trial was refused in the Shea murder case, even though one McG. made affidavit that he, and not Shea, committed the crime. (People v. Shea, 16 Misc. 111; 11 N. Y. Crim. 307.)

" that if mercury or other poisonous substance was given to Rice with the intention of causing sickness and weakened condition which might ultimately lead to his death, and if chloroform was administered for the purpose of hastening death, and death ensued immediately after the application of the chloroform, you may, in determining the cause of death, consider the sickness and weakened condition of Rice in connection with his strength and power of resistance to the effect of chloroform. In other words, if Rice was weakened and sickened by poison which had been given to him for the purpose of producing death by a slow process, and, in addition, poison of a different and more powerful nature was administered to hasten death, you have a right, if you believe that, to regard it all as part of one transaction, and as forming part of one scheme or design."

Under this instruction the jury had a right to determine if death was caused by chloroform or mercury or by both. The purpose of expert evidence is to aid the jury, and not control it, and the verdict of the jury must be taken as a finding upon every question within the scope of their powers.

On this point the Court of Appeals said:

" The finding of mercury in the body corroborated Jones as to his having given mercurial pills to the deceased to weaken his system. If doubt should be thrown upon the probability of Jones being able to administer the chloroform by means of the cone left on the face, the jury, in the light of the evidence of the medical experts for the defense, might believe that the effect of placing the cone upon the face of the deceased was to cause him to pass at once into a state of narcosis or, in his weakened condition, to be stricken by death almost immediately."

This phase of the case passed upon and settled by the verdict of the jury is wholly lost sight of in the proposed opinion evidence. But even a brief reference to that evidence will test its intrinsic worth.

Fourteen experiments on human dead bodies were made by the injection of embalming fluid into the right brachial artery to test whether the fluid could reach the lungs, and, if it could, would it destroy them for diagnostic purposes. Dr. Weston performed or participated in the performance of all fourteen. Notes of three were roughly taken. Notes of four were lost and notes of seven were not made until three months after experiments. Dr. Biggs performed two of these experiments with Dr. Weston, but was not present when the fluid was injected, did not know how much was injected or the circumstances under which the injection was made. He had destroyed his notes in these cases. Dr. Stewart made seven of the experiments with Dr. Weston. He made no notes until five months afterwards. Dr. Brooks made two of the experiments with Dr. Weston after Dr. Weston had injected the fluid, but not in his presence. Of these experiments no notes were taken. All of these experiments were made in a desultory and fugitive manner in the city morgue upon the unknown dead with a singular disregard of those precautions for accuracy of tests, observations and noting results. Where experiments are made for the purpose of testing a theory, the formation of opinion or the ascertaining of conditions or results, accurate notes made during the progress of the experiments are of great value, not only that the witness may be examined and cross-examined upon them, but because scientific data are so minute and involved that they cannot be safely intrusted to the human memory, with its attendant infirmities and uncertainty, and where no notes are made, or, if made, not made for months afterwards, the value of the experiments is depreciated and clouded by doubts of their integrity. Where experiments are made for the purpose of giving evidence of results the law of Scotland, which requires complete notes to be made and filed in court, might well be emulated.

To the lay mind—and that is the mind in the jury box to which this evidence is sought to be submitted—there are some striking features connected with these experiments. The doctors could not tell (a) the elements or chemical properties of the embalming fluids which they used, nor (b) the difference, if any, between the Bellevue and Falcon fluids which were used, nor (c) whether the fluid they used contained the same chemical properties which the fluid contained that was injected into the body of Rice, nor (d) how much fluid had been injected into the body of Rice, nor (e) how much force had been used in that injection, nor (f) the kind of pump that was used, nor (g) did they measure the quantity of force that was used in their injections (a very important thing), nor (h) did they give any explanation of the difference in the degree of force and results between injecting less than a pint into the body of Rice, and injecting in various quantities, from a quart to a gallon, in the several bodies of their subjects (in some cases the fluid injected was not measured), nor (i) did they have accurate knowledge of the process of embalming, but in most cases assumed it on hearsay, nor (j) did they know the specific gravity of or who prepared the solutions of starch and red lead which they used in injections, nor (k) could they tell how long any of the bodies had been dead, nor (l) the cause of death in any one case, nor (m) whether the congestion of the lungs which was found in any one case existed before embalming.

It would seem that where a new trial is sought on the ground of newly discovered evidence obtained by experiments that the method of investigation, the tests applied and therewith the character and sufficiency of the results arrived at, should be scientifically flawless and so invariable and inevitable as to demonstrate a law rather than furnish occasion for speculation.

The conclusion is irresistible that these experiments were not conducted for the love of pure science, that the interests in-

volved were subjective rather than objective, and that the results claimed were tinged with the dominancy of prepossession.

In the discovery and demonstration of truth the law recognizes and avails itself of the light afforded by true scientific research, but the integrity of its established rules for the maintenance of justice cannot be assailed by theories and speculations founded upon experiments that are neither definitive nor conclusive and that cannot be approved by critical science.

It is unnecessary to compare the testimony of Doctors Witthaus, Kemp, Williams and Schultze, the medical experts for the prosecution, with the testimony of the medical experts for the defense. It will be sufficient to point out that a sharp conflict of opinion arises between these learned gentlemen, and where doctors disagree on alleged newly discovered opinion evidence, how can a judge declare that such evidence, burdened as it is with disputations and uncertainties, technicalities and obscurities, would, if presented to a jury, probably cause a different verdict.

On no one of the grounds urged in the motion is there sufficient cause to grant a new trial, and, therefore, it is denied.